59 F.3d 584
 41 ERC 1001, 64 USLW 2056, 25 Envtl.
L. Rep. 21,399
 UNITED STATES of America, Plaintiff-Appellee,
v.
CORDOVA CHEMICAL COMPANY OF MICHIGAN; Cordova Chemical
Company; Aerojet-General Corporation,
Defendants-Appellants (92-2288),
Defendants-Appellees,
CPC International Inc., Defendant-Appellee,
Defendant-Appellant (92-2326),
Arnold C. Ott; Commercial Union Insurance Company, et al., Defendants,
Michigan Department of Natural Resources, Defendant-Appellee.
 Nos. 92-2288, 92-2326.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 25, 1994.
Decided July 14, 1995.
 
 Richard B. Stewart, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Nicholas Bollo, Anne L. Alonzo, U.S. E.P.A., Office of Regional Counsel, Region V, Chicago, IL, John Fogarty, E.P.A., Enforcement & Compliance Div., Washington, DC, Michael L. Shiparski, Thomas J. Gezon, Asst. U.S. Attys., Grand Rapids, MI, Michael J. McNulty, Gregory L. Sukys, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Katherine W. Hazard (argued and briefed), U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, Bradley M. Campbell, U.S. Dept. of Justice, Washington, DC, Patricia L. Sims, E.P.A., Washington, DC, for U.S.
 John V. Byl, Robert J. Jonker (argued and briefed), John D. Tully, Warner, Norcross & Judd, Grand Rapids, MI, for Cordova Chemical Co. of Michigan, Cordova Chemical Co. and Aerojet-General Corp.
 J. Michael Smith (argued and briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for CPC Intern. Inc. in No. 92-2288.
 Robert P. Reichel, Asst. Atty. Gen., Environmental Protection Div., Lansing, MI, Eric J. Eggan, Office of the Atty. Gen., Transp. Div., Lansing, MI, Kathleen L. Cavanaugh (argued and briefed), Office of the Atty. Gen., State Affairs Div., Lansing, MI, for Michigan Dept. of Natural Resources.
 Kenneth S. Geller (briefed), Donald M. Falk, Mayer, Brown & Platt, Washington, DC, for amicus curiae Business Roundtable.
 Robin L. Rivett (briefed), Pacific Legal Foundation, Sacramento, CA, for amicus curiae Pacific Legal Foundation.
 J. Michael Smith (argued and briefed), David M. Buday (briefed), Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for CPC Intern. Inc. in No. 92-2326.
 Before: CELEBREZZE, RYAN, and NORRIS, Circuit Judges.
 NORRIS, J., delivered the opinion of the court, in which CELEBREZZE, J., joined. RYAN, J. (pp. 593-600, delivered a separate dissenting opinion.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 This appeal highlights the difficulty that often attends the apportionment of liability for clean-up costs of sites that have been subjected to long-term environmental degradation. In the present case, brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. Secs. 9601-9674 (1988 & Supp. V 1993), the environmental damage occurred over a period of decades and during the watch of several owners.
 
 
 2
 A central concern on appeal is the criteria required under CERCLA before a parent corporation can be held financially liable for pollution that occurred during the ownership of a subsidiary. Because we adopt a stricter standard than did the district court for imposition of such liability, we reverse certain of its determinations and remand for further proceedings.
 
 I. PROCEEDINGS BELOW
 
 3
 In May and June 1991, the district court conducted a fifteen-day bench trial to determine which parties were responsible for clean-up costs related to pollution of a site located in Dalton Township, Michigan. In addition to the live testimony of twenty-nine witnesses, the court received more than 2,300 exhibits and reviewed dozens of deposition transcripts. Given the complexity of the proceedings below, the factual findings contained in the district court's published opinion are extensive. CPC Int'l, Inc. v. Aerojet-General Corp., 777 F.Supp. 549, 555-70 (W.D.Mich.1991). We summarize them here by way of background.
 
 
 4
 Beginning in 1957, a series of owners used the Dalton Township site to manufacture chemicals. The initial owner, the Ott Chemical Company ("Ott I"), controlled the site from 1957 until 1965. During this time, the groundwater flowing underneath the site became contaminated, a development confirmed by tests conducted in 1964.
 
 
 5
 Pollution of soil, surface water, and groundwater continued after the Ott Chemical Company ("Ott II"), a wholly owned subsidiary of CPC International, Inc. ("CPC"), took over ownership of the site in 1965. The use of unlined lagoons as a means of chemical waste disposal was the principal cause of the contamination. According to the district court, this practice spanned the period from 1959 until at least 1968.
 
 
 6
 Seepage from these lagoons did not, however, constitute the sole source of pollution that occurred during the ownership of Ott I and Ott II. Further contamination emanated from chemical spills from train cars, from chemical drums, from overflows of chemicals contained in a cement-lined equalization basin, and from other sources. Groundwater pollution did not go completely untreated during this time; from 1965 until 1974, purge wells were operated intermittently in an attempt to alleviate the problem.
 
 
 7
 In 1972, the Story Chemical Company ("Story") acquired the site from Ott II and continued to operate it until 1977, when bankruptcy ended operations. At that point, a trustee in bankruptcy assumed title to the site and attempted to find a buyer.
 
 
 8
 Active governmental response to the pollution problems at the site began in 1977, after Story's bankruptcy, when the Michigan Department of Natural Resources ("MDNR") visited the site to assess the situation. In view of the severity of the environmental problems and the lack of resources to pay for a cleanup, the MDNR became active in efforts to attract a purchaser who would participate financially in clean-up efforts. This search led to the signing of a document on October 13, 1977, by the Cordova Chemical Company ("Cordova/California"), a wholly owned subsidiary of Aerojet-General Corporation ("Aerojet"), and the MDNR. The district court described the agreement and its aftermath:
 
 
 9
 It addressed the problem of environmental contamination at the property and set forth obligations with respect to cleanup activities....
 
 
 10
 ....
 
 
 11
 ... MDNR agreed to remedy the waste container and sludge problems, and Cordova/California agreed to eliminate the phosgene gas and give MDNR $600,000 to defray the costs of the agency's cleanup of the waste containers, sludge and residential wells.
 
 
 12
 ....
 
 
 13
 With respect to Cordova/California's $600,000 payment and the company's responsibility or liability for the contamination at the site it was acquiring, the [agreement] stated:
 
 
 14
 ....
 
 
 15
 Cordova Chemical Company shall not have any responsibility or liability in connection with any other corrective actions which the Department of Natural Resources or any other governmental agency may hereafter deem necessary....
 
 
 16
 ....
 
 
 17
 However, the agreement did not provide for a total cleanup of the site's severe environmental problems....
 
 
 18
 In particular, MDNR and Cordova/California did not reach an agreement regarding a remedy for the groundwater contamination problem. Instead, the fate of the groundwater problems was not resolved, with MDNR left to tackle the problem as part of its overall regulatory responsibility for the site.
 
 
 19
 ....
 
 
 20
 ... Cordova/California and MDNR fulfilled their cleanup obligations under the [agreement]....
 
 
 21
 CPC Int'l v. Aerojet-General, 777 F.Supp. at 564-67.
 
 
 22
 Having executed this document, Cordova/California purchased the site the following day from the Story bankruptcy trustee. Cordova Chemical Company of Michigan ("Cordova/Michigan"), a wholly owned subsidiary of Cordova/California, acquired ownership of the site in 1978. Cordova/Michigan retains ownership, although manufacturing operations at the site ceased in 1986.
 
 
 23
 The district court made the following observations regarding conditions at the site during the ownership of the Cordova companies:
 
 
 24
 During their period of operations, [the companies] neither buried waste nor dumped it onto the ground. No chemical waste was disposed into the unlined lagoons that had been used during the Ott I and Ott II eras. Before beginning chemical manufacturing, Cordova/Michigan repaired the equalization basin and chemical sewer system. When operating, Cordova/Michigan discharged chemical waste through off-site disposal or to a sewer that flowed to the Muskegon County treatment facility.
 
 
 25
 Id. at 556. In short, although the preexisting groundwater contamination problem was not remedied during their ownership, the trial court concluded that neither Cordova/California nor Cordova/Michigan exacerbated the condition.[1]
 
 
 26
 The federal Environmental Protection Agency became involved in cleanup of the site in 1981. Since then, the EPA has formulated a long-term response to the environmental damage that has occurred at the site; the cost of this effort will run into the millions of dollars.
 
 II. CERCLA LIABILITY
 
 27
 Section 107(a) of CERCLA lists the parties who are potentially liable for the clean-up costs of a polluted site.[2] 42 U.S.C. Sec. 9607(a). For the purposes of this action, those parties include the present owner and operator of a facility from which there is a release of a hazardous substance, any prior owner or operator of a facility whose involvement coincided with disposal of a hazardous substance, and any person who arranged for the disposal or transport of hazardous waste from a facility. 42 U.S.C. Sec. 9607(a)(1)-(3). The parties stipulated that the site is a "facility" as defined by CERCLA, that it contains "hazardous substances," that "releases" of hazardous substances have occurred and threaten to continue, and that CPC, the MDNR, Aerojet, Cordova/California, and Cordova/Michigan are "persons" as defined by the statute. Id. at 556.
 
 
 28
 Because courts that have been asked to render liability decisions in CERCLA actions frequently invoke the remedial purpose of the act, e.g., United States v. Kayser-Roth Corp., Inc., 910 F.2d 24, 26 (1st Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), we will review that subject before considering the liability of those parties now before us.
 
 
 29
 Congress did enact CERCLA as a "remedial statute designed to protect and preserve public health and the environment." Kayser-Roth, 910 F.2d at 26; accord Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir.1993); Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240, 1241-42 (6th Cir.1991) (reviewing this circuit's approach to CERCLA liability). Accordingly, courts generally will not interpret Sec. 9607(a) in a way that apparently frustrates the statute's goals in the absence of specific congressional intent otherwise. Anspec, 922 F.2d at 1247 (citing New York v. Shore Realty Corp., 759 F.2d 1032, 1045 (2d Cir.1985)).
 
 
 30
 It must be recognized, however, that it is difficult to divine the specific, as opposed to the general, goals of Congress with respect to CERCLA liability since the statute represents an eleventh hour compromise. See generally Shore Realty Corp., 759 F.2d at 1039-42 (discussing legislative history). As the district court recognized, "some of CERCLA's provisions are vague and its legislative history sparse." CPC Int'l v. Aerojet-General, 777 F.Supp. at 571; accord Anspec, 922 F.2d at 1247 (characterizing the legislative history as "scant"); Lansford-Coaldale Joint Water Auth., 4 F.3d at 1221 ("[C]ongressional intent may be particularly difficult to discern with precision in CERCLA, a statute notorious for its lack of clarity and poor draftsmanship.").
 
 
 31
 Courts would not be warranted, therefore, in pointing to the "remedial legislation" litany, see generally Norman J. Singer, 3 Sutherland Statutory Construction Sec. 60.01 (5th ed. 1992) (the rule that remedial statutes should be liberally construed is "firmly established"); Dennis v. Higgins, 498 U.S. 439, 443, 111 S.Ct. 865, 868, 112 L.Ed.2d 969 (1991) (noting that 42 U.S.C. Sec. 1983, as a remedial statue, should be liberally construed), as a means for filling in the blanks so as to discern a congressional intent to impose liability under nearly every conceivable scenario. Thus, while the liability provisions concerning facility operators should be construed so that financial responsibility for clean-up operations falls upon those entities who contributed to the environmental problem, the widest net possible ought not be cast in order to snare those who are either innocently or tangentially tied to the facility at issue. In fact, this court has said, "Congress intended that those responsible for disposal of chemical poisons bear the cost and responsibility for remedying the harmful conditions they created." Anspec, 922 F.2d at 1247 (emphasis added).
 
 
 32
 In turning to the specific facts now before us, we adhere to the tenet that liability attaches only to those parties who are culpable in the sense that they, by some realistic measure, helped to create the harmful conditions.
 
 
 33
 In its effort to discern the sweep of CERCLA liability, the district court concluded that:
 
 
 34
 CERCLA broadens the potential for liability of parent corporations without discarding entirely the traditional concept of limited liability that is central to corporate law....
 
 
 35
 Accordingly, it seems that CERCLA's "owned or operated" language forges a new, middle ground. It is a ground that at once accommodates the general principle of limited liability and the broader principle of liability attaching for operative activity. To permit these principles to coexist under CERCLA, the liability of a parent corporation cannot attach simply because a parent has had involvement with its subsidiary in a manner merely consistent with their investment relationship. Rather, a parent must have actually operated the business of its subsidiary.
 
 
 36
 In this court's view, then, a parent corporation is directly liable under section 107(a)(2) as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates "operator" liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not.
 
 
 37
 CPC Int'l v. Aerojet-General, 777 F.Supp. at 573 (emphasis added).
 
 
 38
 On the basis of this "new, middle ground," the district court found both CPC and Aerojet liable as operators for the disposal of hazardous substances that occurred while their subsidiaries operated the site.
 
 III. DISCUSSION
 A. CPC
 
 39
 The district court reasoned that liability potentially could attach to CPC as a parent corporation in two ways: direct liability under CERCLA's "operator" language or by common law veil-piercing. It determined that CPC was liable as an operator of the site for environmental damage that occurred during the ownership of Ott II; this liability was grounded in section 107(a)(2) of CERCLA, which renders "any person [liable] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. Sec. 9607(a)(2). To reach this conclusion, the court had to find CPC, as a parent corporation, responsible for the conduct of its wholly owned subsidiary corporation, Ott II. Because the court held CPC directly liable as an operator, it did not reach the question of whether CPC was vicariously liable through the traditional common law theory of veil-piercing.
 
 
 40
 It is not at all clear from the district court's opinion whether the standard for finding parental liability under its "new, middle ground" is the actual operation of the subsidiary's business or, on the other hand, the exertion of power or influence through active participation in the subsidiary's business. Although they are used interchangeably in the district court's opinion, the two concepts are not interchangeable. In fact, the facts recited by the district court appear to support liability under the latter standard but not under the former. This confusion underscores the inevitable difficulty that arises when courts attempt to erect new concepts of corporate liability within the framework of CERCLA in the absence of direction from Congress. We are not persuaded that, in enacting CERCLA, Congress contemplated the abandonment of traditional concepts of limited liability associated with the corporate form in favor of a "new, middle ground."
 
 
 41
 CERCLA defines the "owner or operator" of an onshore facility as "any person owning or operating such facility." 42 U.S.C. Sec. 9601(20)(A)(ii). When the facility has been conveyed to a unit of state or local government, the definition differs. It then includes "any person who owned, operated or otherwise controlled activities at such facility immediately [before the transfer to the governmental authority]." 42 U.S.C. Sec. 9601(20)(A)(iii). It thus appears that the drafters of the statute distinguished an operator from a person who "otherwise controlled" a facility. When the owner of a facility contracts out the daily running of the operation to a third party, that party presumably attains operator status (and its attendant liability). However, when a parent corporation actively participates in the affairs of its subsidiary consistent with the restrictions imposed by traditional corporate law, nothing in the definition just cited or in the rest of the statute indicates that the parent has assumed the role of operator.
 
 
 42
 Despite the definition of "owner or operator," several circuits and the district court below have determined that parent corporations can attain operator status by exerting significant control over the operations of their subsidiaries. See, e.g., Kayser-Roth, 910 F.2d at 26-27; Lansford-Coaldale Joint Water Auth., 4 F.3d at 1221; Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir), cert. denied, --- U.S. ----, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992); CPC Int'l v. Aerojet-General, 777 F.Supp. at 572-73.
 
 
 43
 While we understand the district court's desire to extend the reach of CERCLA so that its remedial purpose is given maximum impact, the "new, middle ground" threatens to sweep away the protections long afforded by the corporate form with respect to limited liability. In our view, nothing in the statute or its legislative history supports such a reading. As the Fifth Circuit has noted in this context, "[i]f Congress wanted to extend liability to parent corporations it could have done so, and it remains free to do so." Joslyn Mfg. Co. v. T.L. James & Co., Inc., 893 F.2d 80, 83 (5th Cir.1990).
 
 
 44
 The district court's approach presents a number of problems. First, it replaces the relatively bright line provided by the doctrine of piercing the corporate veil, which typically requires a fraudulent purpose, with a nebulous "control" test. When, precisely, is a parent acting in a manner consistent with its investment relationship as opposed to a manner that triggers operator liability? The indicia enumerated by the district court, such as participation in the subsidiary's board of directors and involvement in specific policy decisions, offer little guidance. Certainly, these activities are not grounds traditionally relied upon to pierce the corporate veil.
 
 
 45
 Second, the threat of unlimited liability will likely deter private sector participation in the cleanup of existing sites. The case before us illustrates this point. There is no dispute that the MDNR actively sought a private sector partner to take over and assist in the remediation of the site. Aerojet indicated an interest on the condition that it could cap its potential liability for environmental cleanup, which it sought to accomplish through the negotiation of the agreement with the MDNR and the use of subsidiaries. To scuttle such sensible and legitimate precautions in favor of an unpredictable "control" test would actually contravene the public interest by discouraging businesses from becoming involved in such projects.[3]
 
 
 46
 In view of its flaws, we reject the district court's "new, middle ground" for defining liability. We conclude that a parent corporation incurs operator liability pursuant to section 107(a)(2) of CERCLA, for the conduct of its subsidiary corporation, only when the requirements necessary to pierce the corporate veil are met.
 
 
 47
 In determining whether the circumstances in this case warrant a piercing of the corporate veil in order to disregard the separateness of the corporate entities, we look to state law. See Anspec, 922 F.2d at 1248. Michigan appears to follow the general rule that at least two definitive requirements must be met in order to pierce the corporate veil. First, there must be such a unity of interest and ownership that the separate personalities of the corporation and its owner cease to exist; second, the circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations Sec. 41.30 (perm. ed. rev. vol. 1990); Stephen H. Schulman et al., Michigan Corporation Law & Practice Sec. 3.9(c) (1991 Supp.); see also Bodenhamer Bldg. Corp. v. Architectural Research Corp., 873 F.2d 109, 111-12 (6th Cir.1989) (citing cases). Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud or reprehensible conduct justifying a disregard of the corporate form. Gledhill v. Fisher & Co., 272 Mich. 353, 359, 262 N.W. 371, 373 (1935).
 
 
 48
 The district court relied upon the following factors in determining that CPC was an "active operator" of its subsidiary and therefore directly liable under section 107(a)(2): 100% ownership of Ott II; participation on Ott II's board of directors; a cross-pollination of officers who were involved in decision-making and daily operations; active participation by CPC officials in environmental matters; and financial control of Ott II through approval of budgets and capital expenditures. CPC Int'l v. Aerojet-General, 777 F.Supp. at 575. While these factors reveal a parent that took an active interest in the affairs of its subsidiary, none of them indicate that CPC utilized the corporate form to perpetrate a "fraud or wrong" as required before a court can pierce the veil.
 
 
 49
 Accordingly, the district court's finding of liability with respect to CPC must be reversed.
 
 B. MDNR Liability
 
 50
 The district court rejected liability claims that were advanced against the MDNR on two fronts: as an operator and as an "arranger." Only the district court's decision regarding arranger liability is appealed.
 
 
 51
 Section 107(a)(3) of CERCLA imposes liability on:
 
 
 52
 any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances.
 
 
 53
 42 U.S.C. Sec. 9607(a)(3).
 
 
 54
 It is contended that the MDNR incurred arranger liability when it negotiated with Cordova/California for the acquisition of the site and agreed with Cordova/California on a plan to clean up the groundwater contamination.
 
 
 55
 We agree with the district court's conclusion that the MDNR escapes liability because its actions were taken in response to an environmental emergency as provided in section 107(d)(2):
 
 
 56
 No state or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence.
 
 
 57
 42 U.S.C. Sec. 9607(d)(2). Our reading of the record indicates that the MDNR acted in good faith when attempting to address the groundwater contamination of the site. That its efforts proved to be less than entirely successful is unfortunate, but does not subject the agency to liability.
 
 
 58
 C. Liability of Aerojet and its Subsidiaries
 
 1. Owner Liability
 
 59
 The district court held both Aerojet and Cordova/Michigan liable as present owners of the site under section 107(a)(1) which assigns liability to "the owner and operator of a vessel or a facility." 42 U.S.C. Sec. 9607(a)(1). Cordova/Michigan does not challenge this decision on appeal and we therefore express no opinion with respect to its liability.
 
 
 60
 As to the parent corporation, the district court appropriately looked to Michigan law in determining whether to pierce the corporate veil. The court, however, misapplied that law. The court determined that Aerojet had "totally dominated Cordova/Michigan, creating a complete identity of interests between the parent and its wholly owned subsidiary." CPC Int'l v. Aerojet-General, 777 F.Supp. at 578. Accordingly, the court determined that it was appropriate to pierce the corporate veil and impose vicarious liability. Among the grounds cited for its decision, the court highlighted the total ownership by the parent, Aerojet's active participation in the acquisition of the site, the timing of the incorporation of the subsidiaries, cross-pollination of corporate officers, financial control, and the integration of the businesses. Id. at 577.
 
 
 61
 These actions, however, do not approach the level of culpable conduct necessary to pierce the corporate veil under Michigan law. Bodenhamer Bldg. Corp., 873 F.2d at 112. While Aerojet obviously sought to limit its liability for existing environmental problems through good faith negotiation with the MDNR and prudent use of the corporate form, there is nothing to suggest that the company acted with fraudulent intent or otherwise sought to distort the legitimate purposes of the corporate forms. Although Aerojet took an active interest in its subsidiaries, we are not persuaded that Cordova/Michigan was anything but a viable corporate entity. Accordingly, the district court erred when it pierced the corporate veil to assign liability to Aerojet as an owner.
 
 
 62
 The district court also noted that Cordova/California actually owned the site from October 1977 until November 1978. Although the company began clean-up operations as required by its agreement with the MDNR, the district court found that additional releases of hazardous substances occurred during this period. CPC Int'l v. Aerojet-General, 777 F.Supp. at 579. It thus imposed liability on Cordova/California as a former owner pursuant to section 107(a)(2).
 
 
 63
 This conclusion, however, conflicts with the district court's summary of activity at the site during the ownership of the Cordova companies. Id. at 556. On remand, therefore, we ask the district court to indicate with greater specificity precisely which portions of the record it relies upon to support a finding that additional releases of hazardous substances occurred during Cordova/California's brief ownership. Absent such evidence, liability will not attach to Cordova/California as a former owner of the site.
 
 2. Operator Liability
 
 64
 Finally, we turn to the district court's alternative imposition of liability on Aerojet pursuant to section 107(a)(2), precisely the same basis for liability that we have already discussed, and rejected, with respect to CPC. Since we reject the "control" test, no liability attaches unless the corporate veil can be pierced. We therefore conclude that Aerojet cannot be held liable as an operator pursuant to section 107(a)(2).
 
 3. Defenses
 
 65
 Upon remand, the district court should also revisit its treatment of the defense raised by Aerojet, Cordova/California, and Cordova/Michigan under section 107(b)(3). The pertinent part of the statute follows:
 
 
 66
 [A] person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by--
 
 
 67
 ....
 
 
 68
 (3) an act or omission of a third party other than ... one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, ... and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....
 
 
 69
 42 U.S.C. Sec. 9607(b) (emphasis added).
 
 
 70
 In parsing the exceptions to the defense, the district court noted that under 42 U.S.C. Sec. 9601(35)(A), the term "contractual relationship" includes deeds transferring title. Thus, the district court concluded that a defense would be unavailable to a defendant who had a direct or indirect contractual relationship with the parties responsible for contaminating the site. CPC Int'l v. Aerojet-General, 777 F.Supp. at 581. Under this view, the defense could not be invoked by any defendant who was a party to a deed with a polluter. The district court, however, ignored the requirement that, in order to render the defense inapplicable, the hazardous substance release must have resulted from the act of a third party "in connection with" the contractual relationship with the defendant. The "in connection with" language of the defense appears to have been designed to preclude a person from escaping liability by contracting for a third party to do his dirty work for him.
 
 
 71
 As we pointed out above, from what we glean from the district court's recitation of facts, the release of hazardous substances appears to have been caused solely by the predecessors of these three defendants.
 
 IV. CONCLUSION
 
 72
 For the foregoing reasons, the district court is reversed in part and affirmed in part and this cause is remanded to the district court for further proceedings consistent with this opinion.
 
 
 73
 RYAN, Circuit Judge, dissenting.
 
 
 74
 The court's opinion today rests primarily on three grounds:
 
 
 75
 . That a parent corporation cannot, as a matter of law, be held directly liable under 42 U.S.C. Sec. 9607(a)(2) as an "operator" of a facility owned and ostensibly operated by its subsidiary corporation, but may face only vicarious liability under state law corporation veil piercing principles;
 
 
 76
 . That piercing the corporate veil under Michigan law requires circumstances showing that the corporate form was used for a "fraudulent purpose."
 
 
 77
 . That the district court erred in finding that the defendants failed to prove their entitlement to the so-called third-party defense under 42 U.S.C. Sec. 9607(b)(3).
 
 
 78
 In my judgment, the court is mistaken on all three grounds, and I therefore respectfully dissent.
 
 I.
 
 79
 Direct Liability of a Parent Corporation under Sec. 9607(a)(2)
 
 
 80
 Nothing in CERCLA, 42 U.S.C. Sec. 9601 et seq., excludes a parent corporation, as a matter of law, from liability for operating a contaminating facility if, in fact, it is operating it. CERCLA identifies the individuals and entities that may be held directly liable as responsible parties, and they include, as relevant here:
 
 
 81
 (1) the owner and operator of a ... facility, [and]
 
 
 82
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.
 
 
 83
 42 U.S.C. Sec. 9607(a)(1), (2).
 
 
 84
 CERCLA defines "owner or operator" as "any person owning or operating such facility," Sec. 9601(20)(A) (emphasis added), and excludes from the definition "a person, who, without participating in the management of a ... facility, holds indicia of ownership primarily to protect his security interest in the ... facility," id. The next subsection defines "person" to include a corporation. Sec. 9601(21).
 
 
 85
 The district court came to the conclusion, as I do, that a parent corporation may face potential liability as an operator of a contaminating facility because the plain language of Sec. 9607(a)(2) indicates that Congress intended to impose liability on any entity actually operating a facility, regardless of the nature of the entity's ostensible interest in the facility. Nothing in the language of Sec. 9607 or elsewhere in CERCLA suggests that Congress's definitions of "operator" or "person" include any corporation except a parent corporation.
 
 
 86
 The majority opinion holds, however, that Congress indeed intended to exclude parent corporations from potential direct liability as facility operators because Congress did not "contemplat[e] the abandonment of traditional concepts of limited liability associated with the corporate form." Maj. op. at 589. But that conclusion seems to me to beg the question. The question under subsection (a)(2) is not whether a parent corporation may be held vicariously liable for abuse of its subsidiary's corporate form--clearly it may--but whether Congress has created direct liability if the facts show that the parent corporation was the actor actually operating a contaminating facility. Stated differently, the issue is whether Congress has excused a parent corporation who is in fact operating a contaminating facility from direct liability, if it is doing so in the name of a corporate subsidiary. The district court thinks not, and I agree.
 
 
 87
 The district court held that a parent corporation may be held directly liable under Sec. 9607(a)(2) as an operator if its level of control over the subsidiary is so complete and pervasive as to exceed mere oversight:
 
 
 88
 In this court's view, then, a parent corporation is directly liable under section 107(a)(2) as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates "operator" liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not.
 
 
 89
 CPC Int'l, Inc. v. Aerojet-General Corp., 777 F.Supp. 549, 573 (W.D.Mich.1991).
 
 
 90
 The question is simply one of fact. The parent corporation is liable if it is shown to have been the operator-in-fact of the facility as indicated by the extent of its domination and control of its subsidiary--the ostensible operator. In such circumstances, there is no issue of veil piercing at all; it is a matter of applying the language of Sec. 9607(a)(2). As the district court pointed out, some of the factors relevant to deciding whether the parent is the operator-in-fact include considerations such as the parent corporation's involvement in the subsidiary's board of directors and daily operations, and the parent corporation's control over the subsidiary's policy making in areas such as personnel, finance, and waste disposal. Also relevant are the facts leading up to the subsidiary's origin and the reasons for its existence, and the parent's level of financial monitoring and its cooperation or consolidation with the subsidiary's accounting, legal, and research functions.
 
 
 91
 At least three other circuits have held that a parent corporation may be held directly liable as an operator under Sec. 9607(a)(2) without any consideration of corporate veil piercing. In United States v. Kayser-Roth Corp., 910 F.2d 24 (1st Cir.1990), cert. denied, 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), the court declared that the plain language of CERCLA compelled the conclusion that parent corporations may be held directly liable under Sec. 9607(a)(2):
 
 
 92
 Congress, by including a liability category in addition to owner ("operators") connected by the conjunction "or," implied that a person who is an operator of a facility is not protected from liability by the legal structure of ownership. Given this grammatical construction and the broad definition of "person," corporate status, while relevant to determine ownership, cannot shield a person from operator liability. In addition, the legislative history provides no indication that Congress intended "all persons" who are "operators" to exclude parent corporations.... Thus, our analysis of the statute and its legislative purpose and history reveals no reason why a parent corporation cannot be held liable as an operator under CERCLA.
 
 
 93
 Id. at 26 (citation omitted).
 
 
 94
 And, "[t]o be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum it requires active involvement in the activities of the subsidiary." Id. at 27.
 
 
 95
 In Lansford-Coaldale Joint Water Authority v. Tonolli Corp., 4 F.3d 1209 (3d Cir.1993), the court embraced the Kayser-Roth standard, emphasizing that "operator liability may be established even without evidence that a [parent] corporation controlled the environmental decisions of an affiliated corporation as long as there exist other factors which sufficiently demonstrate pervasive control." Id. at 1222 n. 13.
 
 
 96
 Similarly, in Jacksonville Electric Authority v. Bernuth Corp., 996 F.2d 1107 (11th Cir.1993), the court agreed that the test for parent corporation liability as an operator was whether the parent " 'exercises actual and pervasive control of the subsidiary to the extent of actually involving itself in the daily operations of the subsidiary. Actual involvement in decisions regarding the disposal of hazardous substances is a sufficient, but not a necessary, condition to the imposition of operator liability.' " Id. at 1110 (quoting Jacksonville Elec. Auth. v. Eppinger and Russell Co., 776 F.Supp. 1542, 1547-48 (M.D.Fla.1991)).
 
 
 97
 Two other circuits apparently would hold a parent corporation directly liable as an operator not because the parent corporation actually controlled the subsidiary, but rather because it had the authority to do so. In Nurad, Inc. v. William E. Hooper & Sons, 966 F.2d 837 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), the Fourth Circuit held that the key inquiry is not whether the parent corporation actually controlled the subsidiary, but rather whether it had the " 'authority to control the operations or decisions involving the disposal of hazardous substances at the [s]ite.' " Id. at 842 (emphasis in original). In dicta, the Ninth Circuit also has identified "authority to control the cause of the contamination" as the standard. Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp., 976 F.2d 1338, 1341 (9th Cir.1992).
 
 
 98
 In addition, the Tenth Circuit, in FMC Corp. v. Aero Industries, Inc., 998 F.2d 842 (10th Cir.1993), applied the Kayser-Roth standard to impose operator liability on a company director directly, and not under state corporation law veil piercing standards.
 
 
 99
 Although I would not go so far as to hold, as the Fourth and the Ninth Circuits would, that mere "authority to control" is sufficient, it is clear that all the circuits that have addressed the point, save one, have found that a parent corporation is exposed to direct liability under Sec. 9607(a)(2) without regard to common law veil piercing.
 
 
 100
 Only the Fifth Circuit has adopted a narrower view of operator liability for parent corporations: "CERCLA does not define 'owners' or 'operators' as including the parent company of offending wholly-owned subsidiaries. Nor does the legislative history indicate that Congress intended to alter so substantially a basic tenet of corporation law." Joslyn Mfg. Co. v. T.L. James & Co., 893 F.2d 80, 82 (5th Cir.1990), cert. denied, 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991). However, another panel of the same court recently observed, in dicta, that an individual shareholder or officer could be held directly liable as an operator:
 
 
 101
 Under traditional concepts of corporate law, the principle of limited liability would protect officers or employees like [the shareholder here] from being held responsible for the acts of a valid corporation. However, CERCLA prevents individuals from hiding behind the corporate shield when, as "operators," they themselves actually participate in the wrongful conduct prohibited by the Act.... In such cases, a defendant can be held individually liable for his wrongful conduct. "[T]his personal liability is distinct from the derivative liability that results from 'piercing the corporate veil' " where we would hold the owners of a less than bona fide corporation responsible for corporate acts.
 
 
 102
 Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc., 931 F.2d 327, 330 (5th Cir.), cert. denied, 502 U.S. 1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991).
 
 
 103
 I conclude, as the district court did, and as the First, Third, Tenth, and Eleventh Circuits have, that a parent corporation may be held directly liable as an operator of a contaminating facility under Sec. 9607(a)(2) if the facts of the case show that its domination and control of the subsidiary corporation ostensibly operating the facility is so pervasive that the parent is the operator in fact.
 
 II.
 CPC's Liability under Sec. 9607(a)(2)
 
 104
 The district court found that CPC, Ott II's parent corporation, so totally and completely controlled Ott II that CPC was the actual operator of the contaminating facility in Dalton Township, Michigan, and is therefore directly liable under Sec. 9607(a)(2) as the operator of the site. I agree.
 
 
 105
 The facts, as found by the district court, are these:
 
 
 106
 From CPC's acquisition of Ott II in October 1965 through April 1966, all four directors on Ott II's board were CPC officers. Over the next three and one-half years, at least three of the eight board members were officers of CPC, and for the following two and one-half years, until CPC sold Ott II, CPC officials comprised the majority of the eleven-director board. At all times during Ott II's existence, the chairman of its board was a high-level CPC executive, appointed by CPC's president.
 
 
 107
 In addition, the managers of Ott II who exerted active control over the subsidiary's day-to-day activities also were officers of CPC. Arnold Ott, who had been chief executive officer of Ott I, continued as Ott II's chief executive officer until 1969, during which time he also was CPC's vice president for scientific research and president of CPC's development company, a subsidiary with oversight responsibility for several CPC subsidiaries including Ott II. In addition, James Eiszner, who had been Ott I's vice president of marketing, served as Ott II's president from 1967 to 1970. During Eiszner's tenure with Ott II, he also served as vice president of CPC's development company, and eventually became CPC's chief executive officer. Moreover, Eiszner, in particular, was criticized during his tenure as an Ott II official for paying too much attention to his CPC responsibilities and not enough attention to Ott II. Beverly Warner served as Ott II's chief executive officer from 1970 until it was sold in 1972, at the same time serving as president of CPC's development company.
 
 
 108
 In addition to CPC's participation through Ott II's board in Ott II's environmental matters, CPC's environmental affairs director, G.R.D. Williams, was influential in setting Ott II's environmental policies. For example, because Williams did not believe Ott II needed a biological waste treatment facility, Ott II officers abandoned presenting plans for such a facility at a meeting with the state of Michigan. In addition, Williams repeatedly controlled the interface between Ott II officials and state and federal regulators, and instructed Ott II's officers "to consult with CPC before responding to regulatory questionnaires or other inquiries." 777 F.Supp. at 561.
 
 
 109
 Finally, as the district court found, CPC's involvement in Ott II's financial affairs involved more than mere review and oversight. For example, CPC made loans to Ott II in excess of $5 million, while assuming many of Ott II's existing loans. In addition, CPC commingled its funds with Ott II's funds. CPC also limited the amount of capital expenditures that Ott II could approve without further approval by CPC's board of directors. As to personnel matters, CPC repeatedly participated in Ott II's labor negotiations with local unions.
 
 
 110
 Based on these and many other findings, the district court concluded that, "[t]he evidence shows a level of participation and control by CPC that exceeds the bounds of an interested investor and enters the realm of an active operator." Id. at 575. These findings are amply supported in the record. Accordingly, the district court's conclusion that CPC was directly liable under Sec. 9607(a)(2) as an operator should be affirmed.
 
 III.
 Aerojet's Liability under Sec. 9607(a)(1)
 
 111
 The district court found Aerojet liable as a present "owner" of a contaminated facility under Sec. 9607(a)(1). It did so after finding that the facts justified piercing the corporate veil that thinly shielded Cordova/Michigan from Aerojet.
 
 
 112
 The majority opinion holds that the district court erred because it misapplied Michigan law: "[The district court's findings do] not suggest that Aerojet operated with a fraudulent purpose; such a fraudulent purpose is, as we read Michigan corporate law, a prerequisite to disregard of the corporate form." Maj. op. at 592 (citing Bodenhamer Bldg. Corp. v. Architectural Research Corp., 873 F.2d 109, 113 (6th Cir.1989)).
 
 
 113
 While there is no question that fraud justifies piercing the corporate veil, there is ample authority under Michigan law for finding parent corporation liability through veil piercing for less egregious unjustified use of the corporate form.
 
 
 114
 The Michigan Supreme Court repeatedly has held that veil piercing is not limited to instances of fraud or illegality. In Potter v. Michigan Bell Telephone Co., 246 Mich. 198, 224 N.W. 438 (1929), the court disregarded the corporate form despite recognizing that "[f]raud [wa]s expressly disclaimed." Id., 224 N.W. at 439. In Herman v. Mobile Homes Corp., 317 Mich. 233, 26 N.W.2d 757 (1947), the court held that when a parent corporation's control of its limited purpose subsidiary is so complete as to result in the subsidiary being a "mere instrumentalit[y]," piercing is appropriate to avoid an injustice, even in the absence of fraud. Id., 26 N.W.2d at 762-63.
 
 
 115
 More recently, the Michigan court affirmed that equity alone may require setting aside the corporate form. In Wells v. Firestone Tire and Rubber Co., 421 Mich. 641, 364 N.W.2d 670 (1984), a plaintiff attempted to avoid the workers compensation exclusivity provision in Michigan law by bringing a tort action against the employer's parent corporation. The court rejected the attempt, invoking the piercing doctrine to find that the parent and employing subsidiary were a single corporate entity. As the court noted, the injustice to be avoided was abrogation of an overriding public policy interest.
 
 
 116
 Our disregard of the separate corporate entities of Firestone and its wholly owned subsidiary is premised upon our recognition of the important public policies underlying the Michigan Worker's Disability Compensation Act and our belief that a contrary determination would be inequitable under the facts of this case....
 
 
 117
 If the statute is to be construed liberally when an employee seeks benefits, it should not be construed differently when the employer asserts it as a defense to a tort action brought by the employee who claimed and accepted benefits arising from that employment relationship.... Indeed, under the facts and circumstances of this case, we would not have permitted Firestone to shield itself behind its wholly owned subsidiary in order to avoid payment of workers' compensation benefits to plaintiff.
 
 
 118
 Id., 364 N.W.2d at 675. The Wells court did not require proof of a "fraudulent purpose."
 
 
 119
 Indeed, this court has observed, in dicta to be sure, that Michigan law permits veil piercing upon a showing of any of the following:
 
 
 120
 (a) a corporation and shareholders have complete identity of interests; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a devise to avoid a legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime.
 
 
 121
 Bodenhamer Bldg. Corp., 873 F.2d at 112 (emphasis added).
 
 
 122
 Thus, while there is authority in Michigan for denying veil piercing where fraud is absent, see Klager v. Robert Meyer Co., 415 Mich. 402, 329 N.W.2d 721 (1982), the weight of authority allows piercing when the shielding corporation is a mere instrumentality and justice requires that it be disregarded.
 
 
 123
 Here, the district court found that Aerojet was the 100 percent shareholder of Cordova/California who, in turn, was the sole shareholder of Cordova/Michigan. In addition, as the district court found, the boards of directors of Cordova/California and Cordova/Michigan were titular only, not even convening for meetings. At least twenty Aerojet officers simultaneously held the same or nearly identical positions in Cordova/California and Cordova/Michigan. Aerojet so completely controlled the finances of all companies, that neither Cordova/California nor Cordova/Michigan were permitted to maintain separate bank accounts. In addition, there was evidence that Aerojet used Cordova/Michigan by transferring to Cordova/California millions in worthless debt owed to Aerojet by Cordova/Michigan, effectively canceling debt owed by Aerojet to Cordova/California. These findings are supported by the record and are not clearly erroneous. The evidence established that Cordova/Michigan operated as a mere instrumentality of Aerojet.
 
 
 124
 Even more compelling are the findings of the district court regarding Cordova/Michigan's corporate purpose. When Aerojet began negotiations with MDNR for the Dalton Township property, Aerojet negotiated side-by-side with its then unincorporated division, Cordova. After Aerojet entered two short-term stipulations with MDNR, and merely eleven days before the sale was concluded, Aerojet incorporated Cordova as a wholly-owned subsidiary. Although Aerojet had initially drafted the stipulation and consent order with MDNR, it was "Cordova Chemical Company" that actually signed the agreement. Then, in November 1978, with the remodeling of the facility complete and manufacturing about to begin, Cordova/California incorporated Cordova/Michigan, transferring to it Cordova/California's ownership of the facility. Despite the supposed separate corporate form of Cordova/Michigan, throughout operations, Aerojet actively participated in negotiations with prospective buyers for the possible sale of the facility. Once Cordova/Michigan ceased operations at the site, it was Aerojet that took responsibility for leasing portions of the site to third parties. Accordingly, it is clear that Aerojet took pains to insulate itself from environmental liability for the situation they knew existed at the site. Aerojet admits as much in their brief:
 
 
 125
 By using well-capitalized, non-fraudulent, separate corporate subsidiaries, such as Cordova/California and then Cordova/Michigan, Aerojet could justify an attempt to reclaim and make the waste Site productive without risking all of its corporate assets. A rule of law imposing enormous environmental liability on parent corporations whose subsidiary neither perpetrated a fraud nor contributed to actual contamination would result in contaminated waste sites being permanently abandoned as unproductive, orphan properties, because no rational corporate officer could support a decision to rehabilitate a contaminated site if such liability were unavoidable.
 
 
 126
 Thus, Aerojet admits that Cordova/Michigan was established solely as a facade, to avoid any legal obligation to pay for further environmental cleanup at the site. Under Michigan law, their admission is sufficient to justify piercing the corporate veil. See Potter, 224 N.W. at 440.
 
 
 127
 As Aerojet points out, it is possible that a refusal to allow a prospective purchaser of a contaminated site to avoid liability will result in a scarcity of willing buyers. Certainly, both EPA and MDNR have a substantial interest in locating conscientious purchasers, who are willing to reclaim environmentally corrupt facilities. However, there is no evidence that the Michigan courts would view this interest as an exception to the state's veil piercing standard, especially in light of the competing interest in imposing environmental cleanup costs on private industry rather than on taxpayers. Congress certainly was not deterred by this argument, given its balancing of interests in favor of imposing liability on new owners. Moreover, Aerojet and the Cordovas are not blameless, as they would have the court believe. The district court found that the entities actively contributed to the contamination and then failed to take remedial action, despite knowledge that contamination was continuing to migrate.
 
 
 128
 Accordingly, the district court's conclusion that, by piercing the corporate veil, Aerojet may be held liable as an "owner" under 42 U.S.C. Sec. 9607(a)(1) should be affirmed.
 
 
 129
 I further agree with the district court that Aerojet was directly liable as an operator under Sec. 9607(a)(2):
 
 
 130
 In light of the same facts that were probative in concluding Aerojet is liable under section 107(a)(1), the court concludes that Aerojet operated the site through active participation and pervasive control over the businesses of both Cordova/California and Cordova/Michigan.
 
 
 131
 As with CPC's involvement with Ott II, Aerojet's participation and control over the board, management and decision-making at Cordova/California and Cordova/Michigan shows that the parent operated the facility. Aerojet's conduct toward its subsidiaries extended well beyond the activities that are merely indicative of a parent's general oversight of a wholly owned subsidiary.
 
 
 132
 Accordingly, the court concludes the [sic] Aerojet is directly liable as an operator under section 107(a)(2).
 
 
 133
 CPC Int'l, Inc., 777 F.Supp. at 580.
 
 IV.
 Third Party Defense under Sec. 9607(b)(3)
 
 134
 I do not agree that the district court should be required, upon remand, to "revisit its treatment of the [third-party] defense raised by Aerojet, Cordova/California and Cordova/Michigan" under Sec. 9607(b)(3).
 
 
 135
 To succeed under Sec. 9607(b)(3), the defendants are required to prove all four elements of a third party defense which are:
 
 
 136
 1. That they did not contribute to the contamination.
 
 
 137
 2. That they were not in a direct or indirect contractual relationship with any person who, in connection with the contractual relationship, caused the contamination.
 
 
 138
 3. That they exercised due care throughout their ownership or operation of the contaminating facility.
 
 
 139
 4. That they protected against those acts and omissions of the polluting persons, and the consequences of those acts and omissions, that were foreseeable.
 
 
 140
 See 42 U.S.C. Sec. 9607(b)(3); see also Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 325 (7th Cir.1994). The district court found that the defendants failed to carry their burden on all four elements of the Sec. (b)(3) defense.
 
 
 141
 The majority opinion, in ordering that the district court "revisit its treatment of the defense" raised by the defendants, addresses only the "contractual relationship" ground. Even if the district court erred in its treatment of that element of the defense, its findings that the defendants have not carried their burden of proving the remaining three elements of the Sec. 9607(b)(3) defense, which the majority opinion does not question, is amply supported in the record.
 
 
 142
 The district court committed no clear error in finding that the defendants demonstrated neither the exercise of due care nor the use of appropriate precautions. For example, in a May 1980 environmental risk report covering Aerojet and several subsidiaries including Cordova/Michigan, the defendants repeatedly stated their intent to take an ostrich approach with respect to the contamination problem:
 
 
 143
 The most significant environmental problems associated with the facility are those relating to the residues of past industrial occupants of the site. Management has adopted the position that any injury to others arising out of contamination from these residues is the responsibility of the State of Michigan Department of Natural Resources and that, accordingly, Cordova should insulate itself from any knowledge of, or involvement in monitoring these wastes.
 
 
 144
 The report went on to acknowledge that waste drums remained buried, despite completion of MDNR's removal efforts. Moreover, the report acknowledged that the stipulation and consent order entered by Cordova and MDNR was never intended to resolve the contamination problem. In describing the responsibilities assumed by the parties under the stipulation and order, the report admitted that MDNR's duties were limited to removing 8700 drums and a portion of the contaminated soil and sludge, and that the consent order's hold harmless clause relieved the defendants only of liability arising out of these specified removal efforts. In addition, as the report acknowledged, the MDNR absolved the defendants of liability relating to procurement of an alternative community water source.
 
 
 145
 As the district court pointed out, and as the report confirms, the stipulation and order did not resolve responsibility for remaining drums and contaminated soil and sludge, as well as responsibility for groundwater contamination. In this regard, the report specifically opined:
 
 
 146
 Between 65 and 100 monitoring wells for testing groundwater were either installed by Story or have been installed more recently under a State/Federal study of groundwater contamination at the site. The study is being carried out by several consulting organizations under contract to the state. Cordova management believes the studies show little or no contamination but has avoided any participation or liaison with the study teams.... Because of the possibility that Cordova's potential liability for groundwater contamination may have survived the Consent Order, it would appear desirable for Cordova management to keep abreast of current monitoring results. In addition, although a high chloride content would show continuation of problems from the old Story wastes, a high sulphate concentration would indicate seepage problems arising out of Cordova's current operations.
 
 
 147
 Accordingly, fully aware that waste drums remained buried beneath the site and that the majority of the contaminated soil had not been removed, and cognizant of groundwater contamination to which they may have been contributing, the defendants believed the solution to these problems was to wear blinders. Their head-in-the-sand approach can hardly be characterized as the exercise of due care.
 
 
 148
 For the same reasons, it cannot be said that the defendants took adequate precautions to protect against the consequences of Ott II's and Story's omissions and acts. While the parties, in their briefs, debate whether reimplementation of the purge wells would have been an adequate precaution, they overlook the big picture. The defendants, fully aware that contamination problems on their property were not being addressed, chose to take no precautions to protect against the foreseeable consequences of these problems--namely, further migration. Accordingly, because the defendants have failed to prove at least two of the requisite elements of the third-party defense, the district court properly held that they were not entitled to invoke it.
 
 
 149
 Since the defendants were required to prove all four elements of the defense, it is unnecessary to consider whether they sustained their burden regarding the remaining two elements, including whether any of the pollution was the act of a third party "in connection with" the contractual relationship with the defendants.
 
 V.
 
 150
 I would affirm the judgment of the district court.
 
 
 
 [1]
 The district court noted that two hazardous chemicals--benzene and 1,2 dichloroethane--were found at the site and used during the Cordova period of ownership. Id. at 556, 579 n. 11. Although Cordova/Michigan, in an April 5, 1984, letter to the federal EPA, acknowledges generating small quantities of these materials for disposal, we find nothing in the record to support a finding that any additional release of hazardous substances occurred at the site during the Cordova period
 
 
 [2]
 42 U.S.C. Sec. 9607(a) states, in part:
 Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section--
 (1) the owner and operator of a ... facility,
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances ...
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for--
 (A) all costs of removal or remedial action....
 
 
 [3]
 Although it does not affect our resolution of the liability issue, we note in passing that these negotiations occurred before the enactment of CERCLA