**PLASKON ELECTRONIC MATERIALS, INC., Plaintiff,**

v.

**ALLIED–SIGNAL, INC., et al., Defendants.**

No. 3:92 CV 7572.

United States District Court, N.D. Ohio, Western Division.

Aug. 4, 1995.

Order Denying Reconsideration, but Clarifying and Amending Judgement Oct. 12, 1995.

---

Charles Randolph Light, Rohrbacher, Nicholson & Light, Toledo, OH, for Plaskon Electronic Materials, Inc., Rohm and Haas Delaware, Inc., Rohm & Haas Company.

Randall W. Knutti, Christopher R. Schraff, Porter, Wright, Morris & Arthur, Columbus, OH, James V. Maher, Allied–Signal, Inc., Law Department, Morristown, NJ, for Allied–Signal, Inc.

Reginald S. Jackson, Jr., Connelly, Soutar & Jackson, Toledo, OH, Robert P. LoBue, Patterson, Belknap, Webb & Tyler, New York City, for Hillside Capital Incorporated, Hillside Industries Incorporated, Hillside Delaware Incorporated, PLK Liquidating Corp.

John C. Barron, Shumaker, Loop & Kendrick, Toledo, OH, Peter C. John, Hedlund, Hanley & John, Chicago, IL, for Trinova Corporation.

Douglas G. Haynam, Fuller & Henry, Toledo, OH, for Libbey Owens Ford Co.

### MEMORANDUM OPINION

KATZ, District Judge.

## I. INTRODUCTION

This case is before the Court on the following motions and responses:

(1) Joint motion for summary judgment of defendants Allied–Signal, Inc. ("Allied–Signal"), Libbey Owens Ford Co. ("LOF") and Trinova Corporation ("Trinova"). Plaintiff Plaskon Electronic Materials, Inc. ("PEMCO") opposes this motion, Allied–Signal, LOF and Trinova filed a joint reply, and Allied–Signal and LOF also filed their own individual replies.

(2) Joint motion for summary judgment of defendants Allied–Signal, Hillside Capital Inc. ("Hillside Capital"), Hillside Industries Inc. ("Hillside Industries"), Hillside Delaware Inc. ("Hillside Delaware") (collectively, these parties will be referred to as the "Hillside Defendants"), PLK Liquidating Corp. ("PLK"), Trinova, and LOF. PEMCO opposes this motion, and Allied–Signal, the Hillside Defendants, PLK, Trinova and LOF filed a joint reply.

(3) Motion for summary judgment of PEMCO against Allied–Signal and PLK. The Hillside Defendants and PLK opposes this motion, and PEMCO filed a reply.

(4) Motion for summary judgment of the Hillside Defendants and PLK. PEMCO and Allied–Signal, in separate memoranda, oppose this motion, the Hillside Defendants and PLK filed a joint reply, and Allied–Signal, at the Court's request, filed a surreply.

(5) Motion for summary judgment of LOF. Trinova and PEMCO oppose this motion, and LOF filed a reply.

This Court has jurisdiction over this matter pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*

## II. STATEMENT OF FACTS

This is an environmental case in which the parties contest liability for the cleanup costs associated with a particular site. The site at issue is located at 2829 Glendale Avenue in Toledo, Ohio, and will be referred to throughout this opinion as "the Site." The Site was used to manufacture plastic and epoxy molding compounds. It was originally owned by the Libbey Owens Ford Glass Company from 1943 to 1953. Manufacturing operations did not begin on the Site until 1947, when construction of the original plant was completed.

In 1953, Libbey Owens Ford Company sold the Site and the attendant operations to Allied Chemical and Dye Corporation. After obtaining the Site in 1953, Allied Chemical and Dye Corporation changed its name to Allied Chemical Corporation. It operated the Site for 26 years and engaged in the production of numerous molding compounds, plasticizers and polyester resins. In 1979, Plaskon Products, Inc. ("PPI") purchased the Site from Allied Chemical. PPI is a subsidiary of Defendant Hillside Industries, Inc. After the sale, Allied Chemical Corporation changed its name to Allied–Signal, Inc.

In 1980, Plaskon Electronic Materials, Inc. ("PEMCO") was established as a wholly owned subsidiary of PPI for the purposes of manufacturing semiconductor-related products and "446" polyester at the Site. At this time, PPI was a wholly-owned subsidiary of Hillside Industries, Inc., which, in turn, was a wholly-owned subsidiary of Hillside Capital, Inc. Like Hillside Industries, Inc., Hillside Capital, Inc. is also a Defendant in this litigation.

PPI leased portions of the Site to PEMCO, which operated the semiconductor. In 1984, PEMCO's stock was sold to Plaskon Holding, Inc., another subsidiary of Hillside Industries, Inc. After the sale, Plaskon Holding, Inc. changed its name to Hillside Delaware, Inc., a Defendant in this litigation. Later in 1984, Plaskon Holdings, Inc. sold the stock in PEMCO to Rohm and Haas Delaware, Inc. Thus, PEMCO became a wholly owned subsidiary of Rohm and Haas Delaware, which is, in turn, a wholly owned subsidiary of Rohm and Haas Company, a large, publicly traded chemical manufacturer with its principal place of business in Philadelphia, Pennsylvania. In conjunction with the sale, Plaskon Products, Inc. changed its name to PLK Liquidating, a defendant in this action. It retains corporate existence today as a subsidiary of Hillside Industries, Inc., but has not had any active operations since 1983. The term "PLK" is used throughout the remainder of this Memorandum Opinion to refer to Defendants PLK Liquidating Corporation and its predecessor in interest, PPI.

After the acquisition by Rohm and Haas Delaware, PEMCO continued its chemical manufacturing operations at the Site until 1991, at which time manufacturing operations in Toledo were terminated and transferred to a new plant in Singapore. After closing its manufacturing operations in Toledo and terminating the remaining PEMCO employees, the structures located at the Site were demolished.

## III. *SUMMARY JUDGMENT STANDARD*

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. 477 U.S. at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## IV. *LAW AND DISCUSSION*

### A. *DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PEMCO (DOC. NO. 106)*

■ Defendants Allied–Signal, TRINOVA and LOF move for summary judgment on the counterclaim that PEMCO is jointly and severally liable for response costs associated with the cleanup of contamination caused by the release of hazardous substances at the Site. PEMCO argues that, while it is the current owner of the Site, it is not jointly and severally liable under 107(a) of CERCLA.

Initially, PEMCO notes that it does not object to the contention that it is a current owner of the Site, and therefore, that it is a responsible party under § 107(a)(1) and the doctrine of strict liability. PEMCO, however, opposes any claim that is jointly and severally liable for all of the response costs at the Site.

In its reply brief to PEMCO's opposition to the motion for summary judgment, LOF raises the argument that PEMCO's action cannot be brought under § 107(a) of CERC-LA, but instead must be brought under § 113(f) of CERCLA. Subsequently, LOF filed a notice of supplemental authorities supporting its position, PEMCO responded and LOF replied to the response. For the reasons set forth below, this Court is convinced that LOF is correct, and that, regardless of how it is pled, PEMCO's only action is a § 113(f) contribution action.

### 1. *Applicable Statutory Provisions*

Section 107(a) of CERCLA states, in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

Section 113(f)(1) of CERCLA, entitled "Contribution," provides as follows:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure,

and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

## 2. *Analysis*

 The question at issue is whether a potentially responsible party ("PRP"), as PEMCO admits it is, is restricted to bringing a contribution claim under § 113(f) or whether such a party may also pursue a cost recovery action under § 107(a). The question is of import because liability under § 107(a) is joint and several, while liability under § 113(f) is merely several. *Kaufman & Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1213–15 (N.D.Cal.1994).

Numerous recent federal court decisions discuss this issue. In *United Technologies v. Browning–Ferris Industries, Inc.*, 33 F.3d 96 (1st Cir.1994), the United States Environmental Protection Agency ("USEPA") had placed the site at issue, located in the State of Maine, on its national priority list. USEPA and Maine thereafter determined that Inmont Corp. had conducted contamination-producing activities at the site from 1950 to 1975. *Id.* at 97. A consent decree was eventually entered into by several parties. Those parties liable under the consent decree then brought suit against Browning–Ferris Industries ("BFI") and others alleging that defendants were wholly or partially responsible for contamination of the site, and seeking recovery of cleanup costs paid directly to USEPA under the consent decree.

The court held that a responsible party under CERCLA is restricted to bringing a contribution claim under § 113. *Id.* at 99. In reaching this conclusion, the court began by defining the term contribution appearing in § 113(f). Giving the term its customary legal meaning, the court defined "contribution" as "an action by and between jointly and severally liable parties for an appropri-ate division of payment one of them has been compelled to make." *Id.* at 99 (*quoting Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994)). The *United Technologies* court then adapted this definition to CERCLA cases and concluded that an action by a responsible party to recover response costs from another responsible party is a contribution action under § 113(f). By contrast, the court characterized actions brought by innocent parties—parties who are not themselves subject to CERCLA liability—as cost recovery actions under § 107(a). After distinguishing cost recovery from contribution actions, the court held that the two types of actions are "distinct and do not overlap." *Id.* at 100. The court noted that the provision in CERCLA governing the limitations period for cost recovery actions—§ 113(g)(2)—is entitled "actions for recovery of costs." The court reasoned that this phrase suggests full recovery of costs and that "it is sensible to assume that congress intended only innocent parties to ... recoup the whole of expenditures." *Id.* Moreover, the court recognized that allowing a liable party to pursue a cost recovery action would swallow the three year limitations period for contribution actions found in § 113(g)(3). If cost recovery actions and contributions are not viewed as separate and direct avenues of recovery, a responsible party could avoid the three year limitations period for contribution actions by simply labeling its action a cost recovery action under § 107, which has a six year limitations period. *Id.*

*United Technologies* is just one of several cases in which courts that have reached the conclusion that "non-innocent" parties cannot bring an action under § 107(a), but must instead bring a contribution action under § 113(f). *See Akzo*, 30 F.3d at 764 (defining suit by one responsible party against another as a contribution action); *United States v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530 (10th Cir.1994), (regardless of how they are pled, claims between PRPs are contribution claims under § 113(f)); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989) (when one party sues another responsible party for its share of response costs, the claim is one for contribution); *Kaufman & Broad–South Bay v. Unisys Corp.*, 868

F.Supp. 1212 (N.D.Cal.1994); *Transtech Industries, Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079, 1087 (D.N.J.1992)).

PEMCO argues that the cases cited above are inapposite to its case because the parties in those cases had apparently admitted § 107 joint and several liability, while PEMCO rejects the claim of LOF and other defendants that it is jointly and severally liable for all of the Site response costs. This position is unconvincing, however, as it is quite clear that PEMCO is liable under § 107(a) because it is the current owner of the Site. Whether it admits § 107(a) liability is irrelevant; as the current owner, PEMCO is a PRP pursuant to § 107(a)(1).

This case is very similar to the situation addressed in *Kaufman.* In that case the current owner of the property, K & B, was held to be a PRP under § 107(a), and therefore allowed only to bring a § 113(f) contribution action. The court stated that "[i]n this case, K & B, as a current owner of a site, is a potentially responsible party under CERCLA.... K & B therefore is relegated to bringing a contribution action ..." *Id.* at 1216. Moreover, the *Kaufman* court stated:

> ... the reality is that the vast majority of private parties will be limited to suing for contribution under [§ 113(f)]. This is so because CERCLA imposes liability on virtually every private party who would have a reason to recoup cleanup costs.
> Therefore, a CERCLA plaintiff, other than the government, will rarely be "innocent" and thus permitted to sue under [§ 107(a)].

*Id.*

Based upon the recent decisions of the First, Fifth, Seventh and Tenth Circuits, as well as the cited district courts, this Court is compelled to conclude that, as the current owner of the Site, PEMCO is a PRP under § 107(a)(1), and therefore not an "innocent party." Consequently, regardless of how its action is pled, this action must be construed to be an action brought for contribution pursuant to § 113(f) of CERCLA. Given this ruling, Defendants may only be held liable for their individual, several and equitable share of responsibility of the recoverable costs incurred by PEMCO.

**B. *PLK'S AND THE HILLSIDE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 116)***

PLK and the Hillside Defendants move for summary judgment on several issues:

(1) Did disposal of hazardous wastes occur during the time that PLK owned and operated the Site?

(2) Are the Hillside Defendants liable under CERCLA on the ground that they are or were affiliated with PLK?

(3) Are the Hillside Defendants liable as indemnitors of Defendant Allied–Signal's environmental liability on the basis of the indemnity clause in the agreement between PPI and Allied–Signal?

(4) Is PLK liable to Allied–Signal pursuant to the indemnity clause?

Each of these issues will be discussed below.

**1. *Did Disposal of Hazardous Wastes Occur During PLK's Ownership?***

Section 107(a)(2) of CERCLA imposes liability for cleanup on, *inter alia,* "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Therefore, unless PEMCO, as the Plaintiff in this action, can show that there is a genuine issue of material fact as to whether PLK owned or operated the Site at the time that hazardous substances were disposed of, summary judgment is warranted.

Section 101(29) of CERCLA incorporates by reference the definition of the term "disposal" in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3):

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

PLK claims that it is not responsible for any Site contamination. There are four separate areas of contamination at the Site: the Wet Dust Settling Pond, the Phthalate Area, and the Methylene Chloride Area, and the East Tank Farm. While PLK admits that it operated the methylene chloride tank in this area, it claims that there is no evidence to show that, between 1979 and 1984, there was any release of methylene chloride into the environment. Moreover, PLK asserts that the presence of methylene chloride contamination at the Site is completely accounted for by the documented spills by both Allied–Signal and PEMCO in the precise area where methylene chloride has been found in the ground water.

■ PLK correctly asserts that speculation that a spill may have occurred during PLK's tenure is insufficient to establish CERCLA liability, or to defeat summary judgment. *Anspec Co., Inc. v. Johnson Controls, Inc.*, 788 F.Supp. 951, 957 (E.D.Mich. 1992) ("conclusory allegations that the hazardous substance located in the soil and surface water of the site are the same as the substances used and disposed of by [defendant] during its ownership and operation of the facility ... [do] not satisfy the specificity requirement under Rule 56 of the Fed.R.Civ. P."). Moreover, mere passive migration of contaminants released by prior owners during a subsequent owner's tenure is insufficient to incur CERCLA liability. *Joslyn Mfg. Co., v. T.L. James & Co.*, 836 F.Supp. 1264, 1269 (W.D.La.1993) ("*Joslyn II* "); *United States v. Petersen Sand & Gravel, Inc.*, 806 F.Supp. 1346, 1351–53 (N.D.Ill. 1992); *Snediker Developers Ltd. Partnership v. Evans*, 773 F.Supp. 984, 987–89 (E.D.Mich. 1991); *Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1456–57 (N.D.Cal.1989); *In Re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 565–66 (Bankr.W.D.Mich.1990). However, "leaking" and "spilling" of hazardous substances during ownership of a facility can result in the imposition of liability under CERCLA § 107(a)(2).

Based on these cases, PLK asserts that there is no evidence that leaking or spilling of the contaminants subject to this litigation occurred during PLK's ownership of the Site. Therefore, PLK claims that it cannot be deemed liable pursuant to CERCLA § 107(a)(2), and summary judgment in its favor is warranted.

Both Allied–Signal and PEMCO respond that, while it is true that passive migration is insufficient to establish CERCLA liability, their claims against PLK go beyond claims of passive migration. They claim that it is uncontroverted that spilling and leaking of hazardous substances at a facility constitutes "disposal" within the meaning of § 107(a)(2) of CERCLA. *See Nurad, Inc. v. William E. Hooper & Sons, Inc.*, 966 F.2d 837, 846 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992) ("we hold that [107(a)(2) ] imposes liability not only for active involvement in the 'dumping' or 'placing' of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was 'spilling' or 'leaking.' ")

Allied–Signal claims that, contrary to PLK's claims, evidence shows that hazardous substances were leaked and spilled at the Site during PLK's ownership and operation of the Site. Allied–Signal points to several pieces of evidence to support this claim:

(1) Doug McKee, an environmental consultant, was hired by PEMCO to survey solid and liquid hazardous wastes on the Site and to make recommendations for their disposal. In a November 18, 1983 memorandum to Malcolm Riddell, president of PEMCO, McKee specifically stated that hazardous wastes were leaking on the Site prior to sale of the Site to Rohm & Haas.

(2) James F. Higgins, who is currently employed by Hillside Industries and who was vice-president of finance and administration for PPI (PLK's predecessor) from 1979 through 1982, testified that a spill of formaldehyde occurred at the site after PPI's acquisition of the Site.

(3) Donald Gore, who had been employed at the Site from 1950 through 1986, including employment as Plant manager during PLK's ownership of the Site, testified that there was occasional leakage as long as the tank was in use, which was until at least 1988.

Thus, Allied–Signal and PEMCO argue that PLK is indeed a statutorily liable person pursuant to CERCLA § 107(a)(2).

Given this testimony, this Court must conclude that summary judgment on this issue is inappropriate. There is a genuine issue of material fact as to whether disposal of hazardous materials occurred during PLK's ownership and operation of the Site. While PLK's liability may be de minimis given that only leakage as opposed to spillage apparently occurred during its ownership period, it is nonetheless true that summary judgment is not appropriate.

### 2. Are The Hillside Defendants Liable Under CERCLA On The Ground That They Are Or Were Affiliated With PLK And PEMCO?

Allied–Signal and PEMCO argue that the facts surrounding the affiliation between the Hillside Defendants and PLK justify the piercing of the corporate veil to hold the Hillside Defendants liable for any environmental liabilities of PLK related to the Site.

For the reasons set forth below, this Court disagrees, and finds that the facts presented do not justify the piercing of the corporate veil.

As stated above, Hillside Capital is a holding company that owns the stock of Hillside Industries, which, in turn, is a holding company that owns the stock of PLK. Hillside Delaware was created in 1984 to hold and transfer the stock of PEMCO to Rohm & Haas.

The Hillside Defendants are each Delaware corporations. Hillside Capital is owned by three individual shareholders: John Irwin III, C. Barnwell Straut, and Edward Bramson. Hillside Capital and Hillside Industries both operate out of a small executive office in New York City. In addition to the three shareholders, who hold the title of Managing Directors of Hillside Industries, Inc., the company has a chief financial officer and secretaries. (Higgins Affidavit at ¶ 4.)[1]

When Hillside Industries acquired the assets of the PEMCO operation from Allied–

---

1. The various positions held by the relevant individuals are summed up in the following table:

| | Hillside Capital | Hillside Industries | PPI | PEMCO | PEMCO | PLK Liquidating |
|---|---|---|---|---|---|---|
| BRAMSON | Man'g Dir.—79–84 VP—79–84 Sh'holder—79–84 | Man'g Dir.—79–84 VP—79–84 | Director— 79–84 | Director— 80–84 | Director–84– VP/Sec.—84 | |
| IRWIN | Man'g Dir.—79–84 VP—79–84 Sh'holder—79–84 | Man'g Dir—79–84 VP—79–84 | Director— 79–84 | Director— 80–84 | Director—84– VP/Treas— 90–93 Director— 84 | Pres/Chair— 90–93 Director— 90–93 |
| STRAUT | Man'g Dir.—79–84 VP—79–84 Sh'holder—79–84 | Man'g Dir.—79–84 VP—79–84 | Director and Chairman of the Board—79–84 | Director— 80–84 | Director—84– President —90–93 84 | Director Chairman & President—90– |
| BENNETT | | | Director—79–84 Pres/CEO— 79–84 | Director—80–84 Chairman— 80–84 | VP/Asst. Sec.—84 | |
| HIGGINS | | VP Fin. & Admin. 84–86 86–present | VP Adm.—79–82 Sec/Treas 79–82 | Secretary 80–81 | | VP/Sec/Treas— 90–93 |
| RIDDELL | | | Director—82– 84 VP Tech—79– 84 | Dir.Pres—80– 84 VP Tech—80– 84 | | |

Signal, five of the six officers of PLK were hold-overs from Allied–Signal's management team. (*Id.* at ¶ 5.) Irwin, Straut, and Bramson were not the only directors of PLK and PEMCO; the board of PLK also included Bennett, Higgins and Riddell, who were officers of the operating company. PEMCO's board also included management personnel such as Bennett and Riddell. The Hillside Defendants claim that the only times that Irwin, Straut and Bramson visited the Site was to attend regularly scheduled director's meetings of PLK or PEMCO. They claim that they did not involve themselves in any way in the day-to-day management of PLK or PEMCO.

Riddell testified that, as president of PEMCO he—not the board of directors—was in charge of the operational affairs of the company. (Riddell Depo. at ¶ 68–69, 117–188.) Riddell had the authority to commit capital resources and enter into substantial contracts for the purchase of materials, supplies, and equipment. (*Id.* at 139, 141–142.) In addition, the two operating companies claim to have controlled the hiring of employees, maintained their own payrolls and bank accounts, maintained their own books, prepared their own financial statements and balance sheets, and held management meetings outside of the regularly scheduled meetings.

Moreover, the Managing Directors of the Hillside Companies assert that they were never involved in directing or overseeing environmental compliance and related matters at the Site. (*Id.* at 243–48.) PLK hired and maintained its own in-house environmental officer—Robert Wholf—who reported directly to PLK management, not the board of directors. (Higgins Depo. at 28.) Any outside environmental consultants were likewise retained by management, not the board.

Allied–Signal and PEMCO point to several facts as evidence that the Hillside Defendants were sufficiently affiliated with PLK to justify holding the Hillside Defendants liable as owners of PLK. These factors include:

- There was and is significant overlap between the boards of PLK and the Hillside Defendants.
- Although on paper the sale of Allied–Signal appeared to be a transaction between Allied–Signal and PPI, the Hillside Defendants were clearly the real parties in interest. Allegedly, Allied–Signal and the Hillside Defendants used the sale as an opportunity to resolve other disputes that had arisen between them that were unrelated to the newly formed PPI. For example, the Hillside Defendants had previously bought Buffalo Color Corporation from Allied–Signal, but part of the purchase price remained unpaid. Accordingly, as part of the Sales Agreement for the Sales Agreement at issue, Buffalo Color Corporation, now a subsidiary of Hillside Industries, reaffirmed its obligation to repay "$13 million amount of 6 percent subordinated notes presently held by Allied Signal," which had been drawn up as part of the previous acquisition. (Higgins Depo. at 138.)

- At least two employees of Buffalo Color had some involvement with the Site. Anthony ten Braak, vice president of Buffalo Color, was hired as a consultant to do audits of the Site in 1979, and J. Gouck, another employee of Buffalo Color, was involved in subsequent environmental audits at the Site.

The Hillside Defendants seek summary judgment on the grounds that they neither owned or operated the Site within the meaning given those terms in CERCLA. There is general agreement that under CERCLA, "owner" liability and "operator" liability denote two separate standards for determining whether they apply. *See Lansford–Coaldale Water Authority v. Tonolli Corp.,* 4 F.3d 1209, 1220 (3rd Cir.1993), and cases cited therein.

### a. *Operator Liability*

The Hillside Defendants argue that they were not operators of the Site. The Sixth Circuit has very recently addressed the issue of operator liability under CERCLA, concluding that "a parent corporation incurs liability pursuant to section 107(a)(2) of CERCLA, for the conduct of its subsidiary corporation, *only when the requirements necessary to pierce the corporate veil are met.*" *United States v. Cordova Chemical Co. of*

*Michigan,* 59 F.3d 584, 590 (6th Cir.1995) (emphasis added).[2] In determining whether the circumstances in a particular case warrant a piercing of the corporate veil in order to disregard the separateness of the corporate entities, the court must look to state law. *Id.* In the instant case, because the Hillside defendants were incorporated under Delaware law, Delaware law governs in determining whether to pierce the corporate veil.

■ "[P]ersuading a Delaware Court to disregard the corporate entity is a difficult task.... The legal entity of a corporation will not be disturbed until sufficient reason appears.... In an appropriate case, however, the corporate veil may be pierced." *Harco Nat'l Ins. Co. v. Green Farms, Inc.* Case No. 1131, 15 Del.J.Corp.L. 1030, 1989 WL 110537 at *3 (Del.Ch. Sept. 19, 1989) (citations omitted). Delaware courts have held that, in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of a corporation demand it, the corporate veil may be pierced. *See, e.g., Pauley Petroleum, Inc. v. Continental Oil Co.,* 43 Del.Ch. 366, 231 A.2d 450 (1967), *aff'd,* 43 Del.Ch. 516, 239 A.2d 629 (Sup.Ct.1968). Further, the *Harco* court explicitly accepted the alter ego theory of piercing the corporate veil, adopting the test set forth by the District Court of Delaware in *United States v. Golden Acres, Inc.,* 702 F.Supp. 1097, 1104 (D.Del.1988), *aff'd* 879 F.2d 860 (3d Cir.1989):

> An alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendant's relationship to that operation. These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in

general, the corporation simply functioned as a facade for the dominant shareholder.... [N]o single factor could justify a decision to disregard the corporate entity, but ... some combination of them was required and that an overall element of injustice or unfairness must always be present, as well.

*Harco* at 1989 WL 110537 at *3 (*quoting Golden Acres,* 702 F.Supp. at 1104).

Allied–Signal claims that the facts of this case are sufficient to justify piercing the corporate veil. The Hillside Defendants, however, argue that there is insufficient evidence to justify piercing the corporate veil. They claim that there is no significant overlap between the boards, and that, except for monthly board meetings, Irwin, Straut and Bramson never came to the Toledo facility. (Riddell Depo. At 243–45.) The Hillside Defendants admit that the boards reviewed proposals presented by management, approved annual budgets, approved marketing plans, approved certain capital expenditures, were informed of operations and environmental matters and the like. However, they claim that those were merely oversight functions that are precisely the purpose of corporate boards.

The Court finds instructive Riddell's sworn testimony that he, not the board, was directly responsible for facility operations and the day-to-day management of the Site, and that he had the ability to commit capital resources. (*Id.*) Riddell testified that he "didn't go to them at all. It would be annual budgets and strategies and that kind of stuff, and then if I had something that was going to cost an appreciable amount of money—or it was something very different from what I had been doing and just wanted to let them know." (*Id.* At 246–47.)

The record shows that the boards of PLK and PEMCO essentially functioned to consent to policies established by the management team, which did not include Irwin, Bramson, or Straut. The board consented to

---

**2.** Other circuits are split on the issue of how to interpret operator liability under CERCLA. The parties provided extensive analysis of the rulings and rationales of these other courts. However, given the Sixth Circuit's recent decision in *Cordova,* a ruling that is binding on this Court, a discussion of these rulings is unnecessary.

such things as policies, budgets, marketing strategies, and operational plans, but, as Riddell stated:

> In all the years I worked as president of PEMCO, I cannot remember any recommendation being turned down. I can only remember one where one of the people, one of the three people, said that he didn't think I should be doing something, that after a matter of time, I just—we went ahead and did it anyway, but that he understood it by that time and that had nothing to do with [the] environmental area.
>
> But with every other proposal I made or capital request I made, market strategy, anything like that was approved.

(*Id.* at 141–42.)

The Court does not find that the portions of the record cited by PEMCO and Allied–Signal are sufficient to raise a genuine issue of material fact as to whether the Hillside Defendants actually controlled PLK so as to justify piercing the corporate veil.

There is no evidence before the Court that PLK was not adequately capitalized, that it was not solvent, that dividends were not paid, that the Hillside Defendants siphoned corporate funds, or that PLK functioned as a facade for the dominant shareholder. *See Harco,* 1989 WL 110537 at *3. The overlap among the boards is simply insufficient under Delaware law to justify piercing the corporate veil. Moreover, there has not been shown to be an overall element of injustice or unfairness present. Accordingly, this court finds that there is no genuine issue of material fact with respect to piercing the corporate veil, and will not hold the Hillside Defendants liable as operators of the Site.

### b. *Owner Liability*

Under CERCLA, a corporation may be held liable as an owner for the actions of its subsidiary in situations where it is determined that piercing the corporate veil is appropriate. *Cordova,* 59 F.3d at 590–91; *Lansford–Coaldale,* 4 F.3d at 1220; *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991). As stated above, such piercing is not warranted

in this case. Therefore, the Hillside Defendants will not be held liable as owners of the Site.

### c. *The Indemnity Clause*

In its counterclaim against PLK and the Hillside Defendants, Allied–Signal claims that PLK and the Hillside Defendants are contractually bound to indemnify Allied–Signal. PLK and the Hillside Defendants move for summary judgment, claiming they are not obligated to indemnify Allied–Signal.

The indemnity clause at issue states as follows:

> (a) Effective the Closing Date, [PLK] shall assume and agree to pay, perform and discharge, and to indemnify [Allied–Signal] against and hold it harmless from the following liabilities and obligations, and only the following liabilities and obligations:
>
> \* \* \* \* \* \*
>
> (2) all obligations, liabilities, costs, and expenses, including reasonable attorneys's fees, relating to the Assets or the operation of the Assets, arising out of claims made, or suits brought, on or after the Closing date for injury, sickness, disease or death of any person, damage to any property, or violations of Federal, state or local laws or regulations relating to the protection of the environment or the safety or health of employees in any case which is ultimately determined by the finder of fact to have resulted in whole or in part from (a) any substance introduced into or removed from the Plants, or discharged from operations, by [PLK]; (b) any product manufactured by [PLK] at either of the Plants; or (c) any condition of any physical asset sold hereunder, real or personal existing on or prior to the Closing Date (whether or not such condition resulted, in whole or in part, from Seller's negligence or fault), provided the incident causing such injury, sickness, disease or death, property damage or violation of laws or regulations relating to the protection of the environment or the safety or health of

employees occurred, in whole or in part, on or after the Closing Date....

State law governs the interpretation of pendent contractual claims asserted in private cost recovery and contribution actions under CERCLA. *AM Int'l Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 994–95 (6th Cir.1993); *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1248 (6th Cir.1991). In deciding which state's law applies, federal courts apply the forum state's choice of law rules. *Boyle v. Jacor Communications, Inc.*, 799 F.Supp. 811, 813 (S.D.Ohio 1992). Under Ohio law, specific choice of law provisions contained in a contract between the parties controls the interpretation of that agreement. *Id.* at 813.

In the instant case, PLK and Allied contractually stipulated that the 1979 Purchase Agreement ("the Agreement") "shall be governed and interpreted in accordance with the laws of the State of New York." *Id.* *See* Agreement at § 25. Therefore, New York law governs the interpretation of the contractual provisions allegedly giving rise to Allied–Signal's cross-claims in this action.

Allied–Signal claims that, based upon the indemnification agreement as interpreted under *Delaware* law, PLK and Hillside, as purchasers of the Site, are to indemnify and hold Allied–Signal harmless for any claims for damage to property which is ultimately determined by a trier of fact to result "in part" from: any substance released by PLK and Hillside, any product manufactured by PLK and Hillside, or any condition on the Site existing at the time of sale (provided that the incident causing such property damage occurred in whole or in part on or after the closing date). Such a claim presents two different inquiries: first, whether PLK, as a party to the agreement, must indemnify Allied–Signal, and second, if so, whether the Hillside Defendants can be held to be a party to the agreement as the alter ego of PLK. Because the Court finds that the first of these questions must be answered in the negative, the second question need not be addressed.

PLK first claims that it is not bound to indemnify Allied–Signal because it did not cause any contamination to the Site. However, as has been discussed above, there is a genuine issue of material fact as to whether PLK contaminated the Site after it acquired it in 1979.

Next, PLK argues that Allied mistakenly treats the indemnification issue as whether a discharge of hazardous substances by PLK at one location will cause it to assume liability for previous contamination at another part of the facility. Instead, PLK asserts:

> that the alleged liability-creating acts of PLK and its resulting potential responsibility under CERCLA based on its own Site ownership and operation are irrelevant. The sole purpose of the indemnification clause is to shift liabilities of Allied–Signal to PLK under certain carefully enumerated circumstances. The only question here is whether the liability of Allied–Signal sought to be established in this action fits within the contractual description of assumed liabilities. It does not.

(Reply Memorandum of Defendants Hillside Capital, Inc., Hillside Industries, Inc., Hillside Delaware, Inc., and PLK Liquidating Corp. at 5.)

PLK goes on to argue that Allied's potential liability in this case under CERCLA does not result in whole or in part from any incident in which PLK may have discharged hazardous substances after Allied sold the Site, but rather from Allied's own disposal activities before it sold the Site. PLK claims that Allied's liability is predicated solely upon the fact that it was an owner and operator of the Site from 1953 through 1979 and disposal of hazardous substances during that time period. "Only if Allied were to be held liable to plaintiff for incidents contributing to contamination that occurred after the 1979 closing date," PLK argues, "would the contractual indemnity take hold." (*Id.* at 6.)

Allied–Signal counters that PEMCO, the Plaintiff in this action, explicitly seeks to have the Court find Allied–Signal "jointly and severally liable" to PEMCO "for any and all its costs of response, resulting from the release and threat of release of hazardous substances at the Site...." (Complaint at p. 12.) PEMCO does not limit its claims for property damage against Allied–Signal to

cleanup costs related to the release of hazardous substances which occurred prior to 1979.

While the Complaint in the instant case would indicate that Allied–Signal is correct, given this Court's ruling that PEMCO's action is one for contribution, regardless of how it is pled, impacts upon the determination at hand. As this Court has found that PEMCO is limited to a contribution action and, therefore, that the Defendants in this case are not subject to joint and several liability, this Court is logically constrained to conclude that Allied–Signal cannot be held liable to PEMCO for incidents contributing to contamination that occurred after the 1979 closing date. Accordingly, the indemnification provision of the 1979 contract is not triggered, and this Court will grant the motion for summary judgment of PLK and the Hillside Defendants on the indemnification issue.

### C. *PEMCO'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 115)*

PEMCO moves for partial summary judgment against Allied–Signal and PLK. Specifically, PEMCO seeks an order from the Court that Allied–Signal and PLK are liable parties in this litigation as a matter of law under § 107(a) of CERCLA, 42 U.S.C. § 9607(a).

The Sixth Circuit has set forth the elements that a plaintiff must prove in order to establish a *prima facie* case for liability for response costs under § 107(a) of CERCLA:

> that the property on which hazardous substances were contained was a facility under CERCLA's definition of that term, that the release or threatened release of any hazardous substance from the facility had occurred, that such release or threatened release caused them to incur response costs that were necessary and consistent with the National Contingency Plan (NCP), and that defendant was one of the statutory classes of persons subject to liability.

*Donahey v. Bogle*, 987 F.2d 1250, 1255 (6th Cir.), *cert. denied sub nom., Donahey v. Livingstone*, —— U.S. ——, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993), *cert. granted, judgment vacated sub nom., Livingstone v. Donahey*,

—— U.S. ——, 114 S.Ct. 2668, 129 L.Ed.2d 805 (1994).

Initially, it must be noted that PEMCO explicitly states that it does not seek summary judgment that the response costs it incurred were necessary and consistent with the NCP. Thus, PEMCO is not arguing that summary judgment is warranted on the entire *prima facie* case; rather, it is merely arguing that there are no genuine issues of material fact with respect to the following elements of the *prima facie* claim:

(1) that the Site constitutes a facility within the meaning of CERCLA;

(2) that a release or threatened release of hazardous substances at the Site has occurred;

(3) that the release or threatened release has caused PEMCO to incur response costs; and

(4) that both Allied–Signal and PLK are covered persons under § 107(a)(2) of CERCLA.

While the Court questions the value of spending numerous pages of analysis to establish what are, for the most part, facts that could be stipulated to, the Court finds no reason that it cannot grant summary judgment, where warranted, on individual elements of a *prima facie* case.

#### 1. *Does the Site Constitute a Facility?*

The term "facility" is defined in CERCLA as

> any building ... equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works) well, pit, pond ... ditch ... or site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise came to be located.

CERCLA § 101(9)(B), 42 U.S.C. § 9601(9)(B). PEMCO contends that the various chemicals used at the Site by all of the past owners are well documented, and that there is no genuine issue of material fact regarding whether the Site is a facility.

Neither PLK nor Allied–Signal argues that the Site is not a facility within the meaning of § 101 of CERCLA. Under Rule 56(e), the

non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate. "The adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his] response, by affidavits or otherwise ..., must set forth specific facts showing there is a genuine issue for trial. If [he] does not so respond, summary judgment, if appropriate, shall be entered against [him]." Fed.R.Civ.P. 56(e). "[I]f the non-moving party fails to discharge that burden [of setting forth specific facts showing there is a genuine issue for trial]—for example, by remaining silent—its opportunity is waived and its case wagered." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992). Consequently, the Court finds that there is no genuine issue of material fact as to whether the Site constitutes a facility under CERCLA, and summary judgment will be granted on this issue.

### 2. Were Hazardous Wastes Released or Threatened to be Released From the Facility?

CERCLA defines the term "release" as "any spilling, leaking, pumping, pouring, emitting, employing, discharging, injecting, escaping, leaching, dumping or disposing into the environment." CERCLA § 101(22), 42 U.S.C. § 9601(22). PEMCO states that it is undisputed that throughout the periods of ownership and operation of the Site by the various Defendants, hazardous substances were released into the ground as the result of spillages, leaks or other discharges.

Neither PLK nor Allied–Signal makes an argument that hazardous wastes were not released or threatened to be released from the facility. Accordingly, summary judgment will be granted on this element of the *prima facie* case.

### 3. Has PEMCO Incurred Response Costs Because of the Releases of Hazardous Substances?

Neither PLK nor Allied–Signal maintains that PEMCO has not incurred response costs in connection with the Site. Therefore, summary judgment will be granted on this element of the *prima facie* case. This does not mean, however, that such response costs were either necessary or consistent with the NCP.

### 4. Did Allied–Signal and PLK Belong to One of the Statutory Classes of Persons Held Liable Under CERCLA?

Section 107(a) of CERCLA provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ..." 42 U.S.C. § 9607(a). PEMCO maintains that, pursuant to this section, both Allied–Signal and PLK are covered persons.

#### a. Allied–Signal

PEMCO argues that it is undisputed that Allied–Signal is a successor-in-interest to Allied Chemical and Dye Corp., which owned the Site under that name or the name of Allied Chemical Corporation from 1957 to 1979. Allied–Signal does not dispute such a contention. Consequently, summary judgment will be granted on this issue.

A successor corporation can be held liable for cleanup costs incurred by its predecessor. *Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240 (6th Cir.1991). The *Anspec* court directed the district court to follow state law in the application of successor liability. Under Ohio law, a corporation that purchases the assets of another corporation is responsible for the contractual liabilities of its predecessor corporation when the buyer corporation is merely a continuation of the seller corporation. *Welco Industries, Inc. v. Applied Companies*, 67 Ohio St.3d 344, 349, 617 N.E.2d 1129 (1993).

#### b. PLK

PLK argues that it is not a responsible person within the meaning of § 107(a) of CERCLA because it did not own or operate the Site at a time of disposal of any hazardous substance. However, as discussed above, there is a genuine issue of material fact as to whether disposal of hazardous substances at the Site took place at the time PLK owned it. Consequently, summary judgment is premature either way as to whether PLK is a PRP.

PLK argues that such testimony is insufficient to meet the burdens of Fed.R.Civ.P. 56. This Court, however, disagrees. Gore, a long-time employee at the Site, testified that there was continual spillage into the ground of methylene chloride, a hazardous chemical, during PLK's ownership of the Site. This unrebutted testimony is sufficient to render PLK a potentially responsible person within the meaning of § 107(a) of CERCLA. The Court notes, however, that such a determination is not to say that PLK is liable. PEMCO has not established that the response costs it incurred were either necessary or consistent with the NCP.

### 5. *Conclusion*

This Court, in ruling on PEMCO's motion for summary judgment, has merely determined that the Site constitutes a facility within the meaning of CERCLA; that a release or threatened release of hazardous substances at the Site has occurred; that the release or threatened release has caused PEMCO to incur response costs; and that both Allied–Signal and PLK are covered persons under § 107(a)(2) of CERCLA. These determinations are not to be construed as a finding that either Allied–Signal or PLK is liable in this case; there has been no showing that the response costs incurred by PEMCO were either necessary or consistent with the NCP. PEMCO has not, therefore, established a *prima facie* case of CERCLA liability; PEMCO has instead merely established selected elements of the *prima facie* case.

### D. MOTION FOR PARTIAL SUMMARY JUDGMENT OF DEFENDANTS ALLIED–SIGNAL, HILLSIDE CAPITAL, HILLSIDE INDUSTRIES, HILLSIDE DELAWARE, PLK, TRINOVA AND LOF

Allied–Signal, the Hillside Defendants, PLK, Trinova and LOF move for summary judgment on certain of PEMCO's claimed response costs, claiming that they are not properly classified as such under CERCLA. As stated above, in order to prove a *prima facie* case under either section 107 or 113 of CERCLA, a plaintiff must prove, *inter alia*, that the release of hazardous substances caused the plaintiff to incur response costs, and that such response costs were both necessary and consistent with the NCP. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989). Thus, to recover expenditures which PEMCO has made at the Site, PEMCO must establish that each expenditure is a "response cost" as defined by CERCLA, and that it was "necessary" to incur such costs. The term "response costs" is defined in section 101(25) of CERCLA, 42 U.S.C. 9601(25):

> The terms "respond" or "response" means [sic] remove, remedy and remedial action; all such terms (including the terms "removal" and "remedial action") include enforcement activities related thereto.

CERCLA differentiates between costs recoverable by the United States or a State on the one hand, and costs recoverable by a private party on the other. The government need only show that its actions were consistent with the NCP in order to recover response costs. § 107(a)(4)(A). A private party, however, must demonstrate that its expenditures were both "necessary" and consistent with the NCP. § 107(a)(4)(B).

Defendants assert that four types of costs upon which these Defendants seek summary judgment were not necessary response costs under CERCLA and therefore cannot, as a matter of law, be recovered by PEMCO. These costs include demolition costs, asbestos removal costs, internal operating costs, and attorney fees.

### 1. *Demolition Costs*

PEMCO seeks to recover the costs of demolishing the buildings that existed on the Site. Defendants argue that such costs are not necessary response costs, but instead were incurred solely in an effort to improve the aesthetics and marketability of the Site after the cessation of manufacturing operations.

When manufacturing operations were halted at the Site in 1990, the buildings and structures on the Site were demolished. Defendants claim that testimony from responsible executives at both PEMCO and Rohm & Haas demonstrates that it was not necessary

to demolish the buildings at the Site in order to implement any remedial activities relating to soil and groundwater contamination.

Defendants cite to the deposition of Robert Master, Safety, Health and Environmental Manager for New Ventures at Rohm and Haas Company:

Q. Can you tell me why PEMCO, or for that matter Rohm & Haas, elected to demolish all of the structures on the site?

A. There were a number of reasons. The economics were looked at [and it was] concluded that tearing these structures down was more economical than leaving them up.... there were concerns that if the building was left up there would be maintenance costs for those buildings. There was a concern that children and derelicts would come on the site and there would be problems from that end, and that we possibly would need full time security guards if the buildings were left up....

(Master Depo. at 238–240.)

Q. Was there a particular reason why the buildings had to be demolished in order to proceed with the cleanup that you've implemented at the site for the ground water or soil contamination?

A. For the corrective action, no.

(Id. at 242.)

A. I would say the buildings were not demolished because of ground water contamination.... I'd make the same statement for soil contamination.

(Id. at 329–330.)

Q. ... the removal of ... raw materials and the removal of ... equipment had nothing to do with either ground water or soil contamination, isn't that correct?

A. That's correct.

(Id. at 332.)

Q. Would you agree, sir, that all the corrective actions taken on site and all the systems that have been installed could have been installed and all actions could have been taken with the presence of the buildings?

A. Yes.

Q. So there was no need to tear down the buildings in order to take the corrective action that was done?

A. That's correct.

Mr. Light: By corrective action—

Mr. O'Shea: As it's described in JJ.

Mr. Light: You're talking about the corrective action undertaken by Woodward–Clyde, not other action that was taken in terms of the diking systems or he testified about the piping system.

Q. Yes, is there any corrective action taken by anyone, any contractor or employee of PEMCO or Rohm & Haas that could not have been performed if the buildings were still on site?

A. The installation of—well, maybe define corrective action. The installation the trenches and the wells and the treatment facility could have been done without the buildings being torn down.

Q. Could have been?

A. Yes.

Q. And is there anything that could not have been done?

A. No.

(Id. at 333–335.)

Defendants further rely on the deposition of Jeffrey Mausteller, the Safety Director at PEMCO's Toledo facility from 1986 to 1989, who also participated in the investigation into contamination at the Site. Mausteller testified as follows:

Q. Okay. You never heard any suggestion while you were there that the buildings needed to be demolished because of contamination of the water or the soil, did you?

A. I recall no discussion of any kind like that.

Q. And would you remember them if they had taken place?

A. I believe so, yes.

Q. To the best of your knowledge, did the buildings themselves pose any risk to the health and safety of the workers?

Mr. Light: What period are you talking about now?

Ms. Daley: During the time that he was employed there.

A. That was one of our concerns, and no, it did not.

Q. So the buildings did not pose any risk?

A. That's correct.

(Mausteller Depo. at 133.)

Moreover, at the time the demolition of the buildings took place, Master was quoted in a newspaper article stating that:

the buildings are being removed to prevent the 50–acre site from becoming an eyesore.... At this point, our objective is to take the buildings down and make it an aesthetically pleasing site.

(*PEMCO Demolition a $1 Million Project,* THE TOLEDO BLADE, Nov. 17, 1990, at 33.)

Based upon this deposition testimony, Defendants argue that the buildings on the Site were not razed to minimize public exposure to hazardous substances, but rather to make the Site more aesthetically pleasing and more marketable. As such, the Defendants argue, the demolition costs were not necessary response costs under CERCLA.

PEMCO argues that the dismantlement expenditures do indeed fall within the scope of the term "necessary costs of response" under CERCLA. PEMCO claims that the buildings on the Site were tied into the Site's underground storm system, and that this system was collecting and discharging contaminated groundwater off the Site into nearby Delaware Creek. PEMCO claims that after trying unsuccessfully to bypass the sections of the underground system collecting the contaminated groundwater and leading to its discharge off-Site, PEMCO was forced to seal the system off at its discharge point and to crush its piping where it was located. (Master Depo. at 39–47.)

PEMCO argues that the discontinuance of the underground storm water system meant that the storm water from the vacant buildings would accumulate on-Site, leading to the possibility that it would infiltrate building foundations, flood building basements through sump pump wells and other sources and cause general building deterioration. PEMCO provides the affidavit of Charles Kovach to support these claims, and PEMCO asserts that these factors presented an endangerment to public health and welfare. Additionally, PEMCO claims that the vacant buildings on the Site would have created an attractive nuisance and would have fostered an invitation for vandalism, compounding their presence as a hazard for the community. (Master Depo. at 239–240.)

Moreover, PEMCO asserts that the removal of the buildings supported the hydraulic containment plan instituted at the Site. PEMCO's response activity at the Site uses wells and a trench. Through these mechanisms, PEMCO captures and collects contaminated groundwater which is subsequently disposed of off-Site. PEMCO provides the affidavit of David Hillman, a hydrogeologist, who avers that the removal of the Site buildings was an essential feature in the PEMCO's response activity in that it relates to an enhanced, beneficial rechargeability of the recovery system implemented at the Site by PEMCO. He further describes the contribution of the dismantled buildings to the minimization of damage which may otherwise occur through migration of contaminated groundwater to noncontaminated areas of the site as well as to areas off-Site. Thus, PEMCO claims that the demolition of the buildings was a "necessary cost" under § 107(a)(4)(B) of CERCLA.

Defendants seek to refute PEMCO's assertions by arguing that the affidavits of Hillman and Kovach contradict the sworn deposition testimony of Mausteller and Master. Defendants claim that the affidavits of Kovach and Hillman were made in hindsight after this litigation had begun, and, as such, must discounted.

This Court agrees with defendants. It is well-established in the Sixth Circuit that "a plaintiff may not create a factual issue for the purpose of defeating a summary judgment motion by filing an affidavit contradicting a statement the plaintiff made in a prior deposition." *Jones v. General Motors Corp.,* 939 F.2d 380, 385 (6th Cir.1991) (*citing Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986). This is precisely what PEMCO has attempted to do in this case. PEMCO's

own executives testified in their depositions that the demolition of the buildings was carried out because it was economically beneficial and because it would avoid the potential for problems resulting from trespassers onto the Site. Mausteller and Master both clearly testified that demolition of the buildings was not a necessary component of the corrective action. The justification offered in the affidavits of Hillman and Kovach cannot contradict such sworn testimony.[3] Defendants summary judgment motion on the issue of demolition costs will be granted.

### 2. Asbestos Removal Costs

 PEMCO claims as response costs $239,000 for the cost of removing asbestos insulation from buildings on the Site during 1987 and 1988, as well as additional costs for removal of asbestos-containing materials as part of its demolition of buildings and other structures on the Site in 1990. Defendants claim that PEMCO cannot recover such costs.

In *Prudential Ins. Co. v. U.S. Gypsum*, 711 F.Supp. 1244 (D.N.J.1989), asbestos had been sprayed onto steel beams, girders, floors, ceilings, walls and ventilation systems of a building. Consequently, as the asbestos-containing materials deteriorated, there was a hazard from the release of asbestos dust. Plaintiffs sought to recover the cost of abating that hazard from the parties who had sold the asbestos, arguing that such parties has disposed of the asbestos. The court rejected such an arguments stating that:

> The applicability of CERCLA to private recovery actions, such as the one presented here, however, has no bearing on plaintiffs'; failure to state a claim under CERCLA since, even without a reference to this legislation, the facts of the complaint fail to set forth a claim under CERCLA since the facts, taken as true, fail to show that Defendants have *disposed* of a hazardous substance.

*Id.* at 1256. (Emphasis in original).[4] This finding is consistent with the findings of other federal courts that CERCLA does not provide a remedy for asbestos removal. *See, e.g., Dayton Indep. School District v. U.S. Mineral Products, Inc.*, 906 F.2d 1059 (5th Cir.1990); *Anthony v. Blech*, 760 F.Supp. 832 (C.D.Cal.1991), *aff'd*, 976 F.2d 525 (9th Cir. 1992); *Retirement Community Developers, Inc. v. Merine*, 713 F.Supp. 153 (D.Md.1989).

PEMCO, in seeking to recover for the asbestos removal costs, relies on *CP Holdings, Inc. v. Goldberg–Zoino & Assocs., Inc.*, 769 F.Supp. 432 (D.N.H.1991). However, although the *CP Holdings* court found that "disposal" had occurred, it explicitly stated that: "it was not the placement of the asbestos products into the building that qualified as a 'disposal,' but rather the sale of the building with the knowledge that the building itself was to be disposed of." *Id.* at 438. Thus, *CP Holdings* is factually distinguishable from the instant case. There is no allegation here that the buildings at issue in the instant case were sold for anything other than continued operation of the Site.

Having considered the arguments presented, this Court determines that, as a matter of law, asbestos removal costs are not recoverable in the instant action. Defendant's motion for summary judgment on this issue will be granted.

### 3. Indirect Costs

Defendants also move for summary judgment on the issue of PEMCO's recovery of indirect costs, i.e. the internal corporate expenditures for reviewing reports and data it claims as part of its response costs. Defendants argue that these expenditures, which total more than $1,182,000, were incurred notwithstanding that Rohm and Haas had employed the services of other outside consultants to perform the same kind of review,

---

**3.** Defendants also dispute PEMCO's factual allegations regarding the need for the demolition of the buildings. However, given the Court's ruling, such issues need not be addressed.

**4.** "As there was no affirmative act to get rid of the asbestos beyond the sale of it as part of a complete, useful product, for use in a building structure, the Plaintiff's allegations fail to reveal that there has been an arrangement for disposal of hazardous substances, even though such substances may have come to eventually flake off and potentially pose a health risk." *Prudential Ins.*, 711 F.Supp. at 1256.

and that the costs did not result in the preparation of any groundwater reports, engineering drawings, costs estimates or actual installation or construction of remedial measures.

■■■ Defendants suggest that this Court adopt the view set forth by the court in *In re Hemingway Transport*, 126 B.R. 656, 663 (D.Mass.1991), *aff'd*, 954 F.2d 1 (1st Cir. 1992), *vacated and remanded on other grounds*, 993 F.2d 915 (1st Cir.1993):

> Nothing in the statutory language of CERCLA indicates that employee time should be considered a cost of response. Rather, employees must be paid whether or not they have spent their time addressing waste cleanup efforts; these costs are not made necessary by the improper disposal of wastes. To interpret CERCLA to require reimbursement of employee time and effort would, in effect, compensate CERCLA plaintiffs for lost employee productivity. But CERCLA was never intended to provide for the recovery of business losses.... Because time spent on cleanup efforts is nothing more than a cost of doing business, I affirm [the bankruptcy judge's exclusion of testimony regarding the value of employee efforts.]

*Id.* at 663.

PEMCO urges this Court to reject the holding of the *Hemingway* court, and instead follow the rationale and result of the court in *Amcast Indus. Corp. v. Detrex Corp.*, 822 F.Supp. 545 (N.D.Ind.1992), *aff'd in part and rev'd in part, remanded*, 2 F.3d 746 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994). In that case, *Amcast* sought recovery of $155,992.28 in indirect costs such as labor expenses and office supplies attributable to its response action.

The *Amcast* court found such costs recoverable, citing *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 706–07 (D.N.J. 1988) in which the Court found that recoverable costs under § 101(23) of CERCLA encompassed the value of the time the company president spent in evaluating and mitigating the contamination problem. The *Amcast* court held that "indirect costs of employee labor and overhead expenses are recoverable, as such costs are 'part and parcel of all costs of the removal action, which are recoverable under CERCLA.'" *Amcast*, 822 F.Supp. at 554 (citations omitted).

This Court notes that, while the Sixth Circuit has not had occasion to address this issue, it has held, in *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir. 1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1994), that the government's internal costs representing overhead expenses attributable to site cleanup were response costs that could be recovered under CERCLA. Although Defendants claim that such a finding does not necessitate the conclusion that a private party can recover such costs, the *T & E Industries* court reached the opposite conclusion:

> Section 8607(a)(4)(A) entitles the government to recover "all costs or removal or remedial action incurred ..." Similarly, § 9607(a)(4)(B) provides that a private party may recover "any other necessary costs of response incurred ..." As noted above, "response" has been defined as "remove, removal, remedy and remedial action...." 42 U.S.C. § 9601(25). Accordingly, CERCLA on its fact, entitles a private entity to recover the same type of costs that the government is entitled to recover.

*T & E Indus.*, 680 F.Supp. at 707.

Given the Sixth Circuit's ruling in *Meyer*, together with the other cases cited above, this Court is not persuaded that the *Hemingway* court's decision is the correct one. Rather, this Court finds the better result and rationale to be stated in the *Amcast* opinion. Consequently, this Court holds that internal costs are recoverable by a private party in a CERCLA action.

■■■ This holding, however, is not a finding that PEMCO is entitled to the entire amount it claims in internal costs. Defendants argue that PEMCO cannot justify the amounts it claims. This is a question of fact the determination of which is not appropriate on summary judgment. At trial the trier of fact is free to determine that a particular cost was not necessary, or that the amount Plaintiff claims for a particular task is not supported by the facts. This Court is merely

holding that indirect costs are not, as a matter of law, barred from recovery under CERCLA.

### 4. *Attorney Fees*

PEMCO seeks an award of attorney fees in this case. The United States Supreme Court recently addressed the recoverability of attorney fees in CERCLA private costs recovery actions. The Court explicitly concluded that "CERCLA § 107 does not provide for the award of private litigants' attorney fees associated with bringing a cost recovery action." *Key Tronic Corp. v. United States*, —— U.S. ——, ——, 114 S.Ct. 1960, 1967, 128 L.Ed.2d 797 (1994).

The *Key Tronic* Court went on to state that

> [t]he conclusion we reach with respect to litigation-related fees does not signify that all payments that happen to be made to a lawyer are unrecoverable expenses under CERCLA. On the contrary, some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B).

*Id.* The Court found that the component of Key Tronic's claim that covers the work performed in identifying other PRPs falls within this category. The Court opined:

> [t]he District Court in this case recognized the role Key Tronic's search for other responsible parties played in uncovering the Air Force's disposal of wastes at the site and in prompting the EPA to initiate its enforcement action against the Air Force.... Tracking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. Key Tronic is therefore quite right to claim that such efforts significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs. These kinds of activities are recoverable costs of response clearly distinguishable from litigation expenses.

*Id.* at ——, 114 S.Ct. at 1967.

■ PEMCO argues that its attorney fees in pursuing this litigation fall within the "identification" exception set forth by the *Key Tronic* court because:

> [t]hese Defendants deny their status as responsible parties, and, thus challenge Plaintiff on the issue of liability. Thus, to finalize its "identification" of these Defendants as responsible parties, they have compelled Plaintiff to pursue litigation against them. Consequently, in the words of the Supreme Court in the *Key Tronic* case, Plaintiff has had to incur litigation costs to "[t]rack down" [these Defendants and accomplish identification of their status as responsible parties in order to increase] "the probability that a cleanup will be effective and get paid for." ... *Id.,* at p. 807. It is just these kind of costs that the Supreme Court viewed in the *Key Tronic* case as recoverable. To the extent that Plaintiff is successful in this litigation in the identification of any of the Defendant who have denied they are responsible, Plaintiff should be able to recover its associated legal costs.

(Response of Plaintiff to Motion for Partial Summary Judgment of Defendants on Certain Response Costs Claims of Plaintiff at 23.)

This argument is entirely unpersuasive. Such a holding by this Court would allow the identification exception to swallow the *Key Tronic* Court's rule that litigation expenses are not recoverable. Such a result would be incongruous. PEMCO cannot recover attorney fees incurred for this litigation.

■ PEMCO further claims that the affidavits of Robert Master and Thomas Macphee disclose the incurrence of legal expenses by PEMCO in order to identify certain Defendants as PRPs. That is, PEMCO claims that it had to incur legal fees to ascertain the past owners of the Site and any entities having connection with past owners. This is apparently the $127,219 figure PEMCO is seeking to recover as "pre-litigation" identification costs. However, Exhibit JJ to Master's deposition, which is an itemization of costs entitled "Plaskon Contamination Cleanup Costs (Through 08/31/92)" contains the following two entries:

13. [Rohrbacher, Nicholson & Light] for legal input on regulatory matters, permits, etc. — 19,120

19. [Rohrbacher, Nicholson & Light] for legal input on regulatory matters — 108,099

 The total of these two entries is $127,219. This Court finds that the description of these items does not encompass identification costs. While this Court agrees that pre-litigation identification costs are recoverable pursuant to *Key Tronic,* this Court finds that the amount of such costs is an issue of fact to be proven at trial.

### E. *LOF'S MOTION FOR SUMMARY JUDGMENT AGAINST TRINOVA (Doc. No. 121)*

LOF moves for summary judgment against Trinova. PEMCO has named as defendants both LOF and TRINOVA, on the theory that one or the other entity is the successor in interest to the "Libbey Owens Ford Glass Company" which owned PEMCO from 1943 to 1953. LOF seeks summary judgment on this issue.

### 1. *Corporate History of LOF/TRINOVA*

 From 1943 to 1953, PEMCO was a division of the Libbey Owens Ford Glass Company. In 1953, Libbey Owens Ford Glass Company sold PEMCO to Allied–Signal. In 1968, approximately 15 years after the sale of PEMCO, Libbey Owens Ford Glass Company changed its name to Libbey Owens Ford Company.

Several transactions took place in 1986. Libbey Owens Ford Company incorporated its previously unincorporated glass business under the name "LOF Glass, Inc.," and transferred the assets of the glass business to the newly-created LOF Glass, Inc., which also assumed the liabilities associated with the glass business. These transactions were accomplished through a Transfer and Assumption Agreement ("TAA"). The stock of the newly-formed LOF Glass, Inc. was then sold to Pilkington via a Share Exchange Agreement ("SEA"). Together, the TAA and the SEA resulted in the transfer of the "LOF Glass Business" of Libbey–Owens–Ford Company to Pilkington. Libbey Owens Ford Company retained Vickers, Inc., Aeroquip Corporation, LOF Plastics, Inc. and various other assets and liabilities of its corporate shell. Libbey Owens Ford Company then changed its name to TRINOVA Corporation. "LOF Glass Business," incorporated as LOF Glass Inc. and now owned by Pilkington, changed its name to Libbey Owens Ford Co.

The outcome of these transactions is that two entities now exist: TRINOVA and Libbey Owens Ford Co., which is referred to as "LOF" throughout this opinion. Both of these entities are named as defendants in this action. The question presented in LOF's motion for summary judgment is which of these entities is responsible for the liabilities associated with the Plaskon division of the original Libbey–Owens Ford Glass Company.

In order to answer this question, this Court must look to the language of the SEA and the TAA. Both contain essentially the same definition of the term "LOF Glass Business:"

> "LOF Glass Business" means all the business of the LOF and its Affiliates, consisting of the production, manufacture, tempering, laminating, coating, sale and distribution of automotive glass, flat glass for mirrors and construction, coated glass products, insulating windows and other glass products, and activities incident thereto, including, without limitation, the acquisition, ownership, financing and use of the associated real and personal property, operation of facilities and equipment, employment of personnel, sale of products, ownership and use of the rights and property described in Schedule 1.01(a) and LOF's direct or indirect stock or other ownership interests in each Subsidiary or other Person listed in schedule 5.06, and contractual arrangements with respect to each of the foregoing.

(SEA at 4.) Similarly, the TAA states that:

> WHEREAS, LOF, acting through its LOF Glass division, is engaged in the business of *production, manufacture, tempering, laminating, coating, sale and distribution of automotive glass, flat glass for mirrors*

*and construction, coated glass products, insulating windows and other glass products, and activities incident thereto, including, without limitation, the acquisition, ownership, financing and use of the associated real and personal property, operation of facilities and equipment, employment of personnel, sale of products, ownership and use of the rights and property described* herein and the *direct or indirect stock or other ownership interests in* the entities listed in Schedule 1(p) hereto, and *contractual arrangements with respect to each of the foregoing* (the "LOF Glass Business").

(TAA at 1.) The portions of the above which are emphasized are the portions that are identical to the definition of "LOF Glass Business" contained in the SEA.

The SEA also contains a definition of "LOF Glass Liabilities" that includes all liabilities of or Associated With the LOF Glass Business, whether known or unknown, and whether accrued, contingent, threatened or otherwise, including, without limitation, executory obligations, tax liabilities and the Scheduled Contingent Liabilities but excluding any liabilities exclusively or primarily pertaining to or arising out of the ownership and use of the rights and property listed in Schedule 1.01(b)....

(SEA at 4.) Additionally, the SEA contains an "Indemnity" provision that states that:

LOF Glass agrees to indemnify and hold LOF harmless against and from any and all loss or damage, including attorney's fees and other costs and expenses, resulting from any obligation or liability founded upon or arising out of any of the following:

(a) obligations or liabilities assumed by LOF Glass pursuant to Section 3;

(b) all claims, existing or future, known or unknown, whenever arising, and related to or arising in connection with the LOF Glass Business with respect to product warranties, product liability and patent infringement; and

(c) any and all other obligations or liabilities, existing or future, known or unknown, absolute or contingent and related to or arising out of events or occurrences in connection with the LOF Glass

Assets or the LOF Glass Business, whether arising before or after the Effective Date.

(TAA at 6).

This Court's reading of the SEA and TAA, and particularly of sections quoted above, belie tying the definition of the historical "LOF Glass Business" to the environmental liabilities associated with the former PEMCO division, and indicate instead that the liabilities are properly assessed to TRINOVA. Without tying the definition of "LOF Glass Business" to the historical definition of the LOF glass business there is nothing to impute to LOF the assumption of liability for the obligations of prior owned assets related to glass division only through historical perspective. In other words, what LOF bought was the existing glass business and what it assumed were the liabilities created by those assets and that business. The plastics operations, which is what PEMCO was, went with TRINOVA, and, this Court believes, so did the liabilities for the environmental problems at issue in this case. Accordingly, LOF's motion for summary judgment will be granted.

## V. *CONCLUSION*

In summary, for the reasons set forth above, the Court will rule as follows:

A. The motion for partial summary judgment of Defendants Allied–Signal, Trinova Corporation, Libbey Owens Ford (Doc. No. 106) is granted.

B. The motion for summary judgment of Defendants PLK and the Hillside Defendants is denied with respect to the issue of whether disposal of hazardous wastes occurred while PLK Liquidating Corporation owned the Site; granted with respect to the issue of the Hillside Defendants' liability as corporations affiliated with PLK; and granted with respect to the issue of the indemnity provisions.

C. PEMCO's motion for partial summary judgment against Allied–Signal and PLK is granted in that the Court rules that:

1. the Site constitutes a "facility" under CERCLA;

2. a release of hazardous substances at the Site has occurred;

3. that release has caused PEMCO to incur response costs; and

4. Allied–Signal is a covered person under § 107(a)(2) of CERCLA.

The motion for partial summary judgment is denied with respect to the question of whether PLK is a covered person under § 107(a)(2) of CERCLA.

D. The motion for partial summary judgment of Defendants Allied–Signal, the Hillside Defendants, PLK, Trinova and LOF (Doc. No. 109) is granted with respect to demolition costs, asbestos removal costs and attorney fees, and is denied with respect to indirect costs and pre-litigation costs. The *amount* of the indirect costs and pre-litigation costs, however, remain as issues of fact.

E. LOF"s motion for summary judgment (Doc. No. 121) is granted.

IT IS SO ORDERED.

### MEMORANDUM OPINION ON RECONSIDERATION

This case is before the Court on the following motions and responses:

(1) Defendant Allied Signal's motion for reconsideration, the Hillside Defendants' opposition, and Allied Signal's response thereto;

(2) Plaintiff's motion to clarify and the Hillside Defendants' opposition thereto;

(3) Defendant TRINOVA's motion to amend judgment, Defendant LOF"s response, Trinova's reply, and LOF"s surreply thereto.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9601, *et seq.*

### ALLIED SIGNAL'S MOTION FOR RECONSIDERATION

■■■■ Motions for reconsideration are "extraordinary in nature and, because they run contrary to notions of finality and repose, should be discouraged." *In Re August, 1993 Regular Grand Jury,* 854 F.Supp. 1403, 1406 (S.D.Ind.1994). As such, motions for reconsideration are granted "very sparingly." *Ba-*

*kari v. Beyer,* 870 F.Supp. 85, 88 (D.N.J. 1994). Generally, there are three major situations which justify a court reconsidering one of its orders: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or to prevent manifest injustice." *Bermingham v. Sony Corp. of America, Inc.,* 820 F.Supp. 834, 856 (D.N.J.1992), aff'd, 37 F.3d 1485 (3rd Cir.1993).

■■■■ Motions for reconsideration are not substitutes for appeal nor are they vehicles whereby a party may present arguments inexplicably omitted in prior proceedings. *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991), *aff'd sub nom.* 22 F.3d 303 (3rd Cir.1994), *cert. denied sub nom.,* — U.S. ——, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995). "A party seeking reconsideration must show more than a disagreement with the Court's decision, and 'recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *Database America, Inc., v. Bellsouth Advertising & Pub. Corp.,* 825 F.Supp. 1216, 1220 (D.N.J. 1993), citing *G–69 v. Degnan,* 748 F.Supp. 274, 275 (D.N.J.1990).

■■■■ Allied Signal's contention is that a genuine issue of material fact exists as to whether the Hillside Companies are liable as owners or operators of the Site. In support of their motion, Allied Signal argues that evidence *has been* presented which warrants reconsideration of the Court's judgment. However, as noted by the Hillside companies, Allied Signal asserts nothing new that was not already presented to the Court. Allied Signal is not entitled to a second bite of the apple and the motion for reconsideration will be denied.

### PLASKON'S MOTION FOR CLARIFICATION

Plaintiff, Plaskon Electronic Materials, Inc. moves for clarification as the language in the Memorandum Opinion is in conflict with the judgment entry regarding PLK Liquidating Corp.'s status as a covered person under § 107(*l*)(2) of CERCLA.

At page 661 of the Memorandum Opinion, the Court stated:

PLK argues that such testimony is insufficient to meet the burdens of Fed. R.Civ.P. 56. This Court, however, disagrees. Gore, a long-time employee at the Site, testified that there was continual spillage into the ground of methylene chloride, a hazardous chemical, during PLK's ownership of the site. This unrebutted testimony is sufficient to render PLK a potentially responsible person within the meaning of § 107(a) of CERCLA. The Court notes, however, that such a determination is not to say the PLK is liable. PEMCO has not established that the response costs it incurred were either necessary or consistent with the NCP.

### 5. *Conclusion*

This Court, in ruling on PEMCO's motion for summary judgment, has merely determined that the Site constitutes a facility within the meaning of CERCLA; that a release or threatened release of hazardous substances at the Site has occurred; that the release or threatened release has caused PEMCO to incur response costs; and that both Allied–Signal and PLK are covered persons under § 107(a)(2) of CERCLA.

In contrast, the Judgment Entry states that the motion for partial summary judgment is denied with respect to the question of whether PLK is a covered person under § 107(a)(2) of CERCLA. (Judgment Entry at p. 2.) Plaintiff is correct that conflict exists and the judgment entry will be amended to reflect the Court's conclusion in the Memorandum Opinion.

### TRINOVA'S MOTION TO ALTER OR AMEND JUDGMENT

TRINOVA seeks to delete and/or clarify the language contained the August 4, 1995 Memorandum Opinion, which it claims is unnecessary to the Court's decision of summary judgment in favor of LOF. The specific language contested is set forth in italics as follows:

This Court's reading of the SEA and TAA, particularly of sections quoted above,

belie tying the definition of the historical "LOF Glass Business" to the environmental liabilities associated with the former PEMCO division, and indicate that the liabilities are properly assessed to TRINOVA. *Without tying the definition of "LOF Glass Business" to the historical definition of the LOF glass business there is nothing to impute to LOF the assumption of liability for the obligations of prior owned assets related to glass division only through historical perspective. In other words, what LOF bought was the existing glass business and what it assumed were the liabilities created by those assets and that business.* The plastics operations, which is what PEMCO was, went with TRINOVA, and, this Court believes, so did the liabilities for the environmental problems at issue in this case. Accordingly, LOF's motion for summary judgment will be granted.

Memorandum Opinion at p. 43.

It is TRINOVA's position that under the TAA, LOF assumed liabilities arising from prior-owned assets of LOF Glass and that the language, as stated above, does not reflect this fact. Because of the possibility of confusion over the Court's language, TRINOVA fears that this language may precipitate unnecessary disputes between itself and LOF. TRINOVA is not, at this juncture, contesting the Court's finding of summary judgment in favor of LOF.

In response, LOF states it "has never acknowledged that it assumed the liabilities associated with any prior owned assets of the former glass division, *other than those set forth in the Disclosure Letters to the TAA and SEA.*" LOF's response at p. 3. It appears to the Court that this is what TRINOVA is also saying. LOF further argues that granting TRINOVA's motion will prompt further disputes between them in this litigation. However, in this Court's opinion, if the language is modified using LOF's above italicized language, the ambiguity is resolved. Accordingly, TRINOVA's motion for clarification will be granted and the Memorandum Opinion will be clarified by interlineation as follows:

Without tying the definition of "LOF Glass Business" to the historical definition of the LOF glass business there is nothing to impute to LOF the assumption of liability for the obligations or prior owned assets related to the glass division only through historical perspective, other than those set forth in the Disclosure Letters to the TAA and SEA. In other words, what LOF bought was the existing glass business and what it assumed were the liabilities created by those assets and those facilities specifically described in the Disclosure Letters to the TAA and SEA.

## CONCLUSION

For the above stated reasons, Allied Signal, Inc.'s motion for reconsideration (Doc. No. 205) is denied. Plaskon Electronic Materials, Inc.'s motion to clarify judgment (Doc. No. 208) is granted. Finally, TRINO-VA's motion to amend judgment (Doc. No. 209) is granted.

IT IS SO ORDERED.